## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 17-22643 COOKE/GOODMAN

|  |  |  |
|---|---|---|
| FEDERAL ELECTION COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MOTION FOR SUMMARY |
| DAVID RIVERA, | ) | JUDGMENT |
| | ) | |
| Defendant. | ) | |
| | ) | |

### FEDERAL ELECTION COMMISSION'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Federal Election Commission ("Commission") respectfully moves the Court for Summary Judgment in its favor pursuant to Federal Rule of Civil Procedure 56.  For the reasons set forth more fully in the accompanying Memorandum of Law, Statement of Material Facts Not in Genuine Dispute, the Declarations in support thereof and the Exhibits attached thereto, there is no genuine dispute of material fact and the Commission is entitled to summary judgment for Rivera's making of contributions in the name of another in violation of 52 U.S.C. § 30122.

WHEREFORE, the Commission respectfully requests that the Court grant its motion for summary judgment; declare that Rivera violated 52 U.S.C. § 30122; award a civil penalty of $456,000; and issue a permanent injunction to prevent the defendant from engaging in future similar violations.

Respectfully submitted,

Lisa J. Stevenson (Special Bar No. A5502354)
Acting General Counsel
lstevenson@fec.gov

/s/ Greg J. Mueller
Greg J. Mueller (Special Bar No. A5502376)
Attorney
gmueller@fec.gov

Kevin Deeley (Special Bar No. A5502355)          /s/ Shaina Ward
Associate General Counsel                        Shaina Ward (Special Bar No. A5502563)
kdeeley@fec.gov                                  Attorney
                                                 sward@fec.gov


                                                 FOR THE PLAINTIFF
August  10, 2020                                 FEDERAL ELECTION COMMISSION
                                                 1050 First Street, NE
                                                 Washington, D.C.  20463
                                                 (202) 694-1650

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 17-22643 COOKE/GOODMAN**

| | |
|---|---|
| FEDERAL ELECTION COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | MEMORANDUM IN SUPPORT OF |
| ) | MOTION FOR SUMMARY |
| v. ) | JUDGMENT |
| ) | |
| DAVID RIVERA, ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFF FEDERAL ELECTION COMMISSION'S**
**MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL BACKGROUND.................................................................................2

III.    STATUTORY BACKGROUND............................................................................3

IV.     ARGUMENT ..........................................................................................................6

        A.      Summary Judgment Standard ...........................................................6

        B.      The Undisputed Evidence Establishes That Rivera Violated
                FECA by Making a Contribution in the Name of Another.............................6

                1.      Documentary Evidence and Corroborating Witness
                        Testimony Establishes Rivera's Liability ................................7

                2.      Rivera's Own Statements Further Establish His Liability..................13

V.      THIS COURT SHOULD ORDER A CIVIL PENALTY AND
        INJUNCTIVE RELIEF............................................................................16

        A.      Rivera Should Pay a Significant Civil Penalty ................................16

                1.      Rivera's Violations Were Knowing and Willful ................................17

                2.      Rivera's Violations Injured the Public................................18

                3.      Rivera's Ability to Pay........................................................19

        B.      This Court Should Declare That Rivera Violated
                52 U.S.C. §30122, and Enjoin Rivera from Committing
                Future Violations ......................................................................20

CONCLUSION.....................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allen v. Tyson Foods, Inc.*, 121 F.3d 642 (11th Cir. 1997)........................................6

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................6, 15

*Arceo v. City of Junction City, Kan.*, 182 F. Supp. 2d 1062 (D. Kan. 2002)............................8

*Buckley v. Valeo*, 424 U.S. 1 (1976) ..............................................................4, 12, 19

*Buckrem v. Dunphy*, 2006 WL 8443533 (N.D. Fla. Dec. 20, 2006)........................................15

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................................8

*Earley v. Chamption Int'l Corp.*, 907 F.2d 1077 (11th Cir. 1990) ........................................15

*FEC v. Am. Fed'n of State, Cnty. and Mun. Emps. - P.E.O.P.L.E. Qualified*, 88-cv-3208, 1991 WL 241892 (D.D.C. Oct. 31, 1991) ....................................18

*FEC v. Comm. of 100 Democrats*, 844 F. Supp. 1 (D.D.C. 1993)....................................17, 20

*FEC v. Craig for U.S. Senate*, 70 F. Supp. 3d 82 (D.D.C. 2014) ..............................16, 17, 18

*FEC v. Furgatch*, 869 F.2d 1256 (9th Cir. 1989) .................................................. *passim*

*FEC v. O'Donnell*, 2017 WL 1404387 (D. Del. Apr. 19, 2017) ......................................17, 20

*FEC v. Rivera*, 333 F.R.D. 282 (S.D. Fla. 2019)........................................................5

*Feldman v. Cutting*, 2009 WL 4021364 (S.D. Fla. Nov. 19, 2009)........................................15

*Fullman v. Graddick*, 739 F.2d 553 (11th Cir.1984) ....................................................6

*Goland v. U.S.*, 903 F.2d 1247 (9th Cir. 1990)........................................................12

*Mariani v. United States*, 212 F.3d 761 (3d Cir. 2000) ................................................4

*McCutcheon v. FEC*, 572 U.S. 185 (2014) ............................................................19

*Solliday v. Fed. Officers*, 413 F. App'x 206 (11th Cir. 2011) ..................................15

*Sun v. Girardot*, 237 Fed. Appx. 415 (11th Cir. 2007)................................................15

*U. S. v. Danielcyzk*, 788 F. Supp. 2d 472 (E.D. Va. 2011) ......................................16

*U. S. v. Hopkins*, 916 F.2d 207 (5th Cir. 1990) ...........................................................................18

*U. S. v. O'Donnell*, 608 F.3d 546 (9th Cir. 2010)..............................................................4, 5, 19

*U. S. v. Smukler*, 330 F. Supp.3d 1050 (E.D. Pa. 2018) .........................................................12

*U. S. v. Smukler*, 2018 WL 3416401 (E.D. Pa. July 13, 2018)..........................................12, 13

*U. S. v. Whittemore*, 944 F. Supp. 2d 1003 (D. Nev. 2013)....................................................17

*U.S. v. Whittemore*, 776 F.3d 1074 (9th Cir. 2015) .................................................................18

*Van T. Junkins and Assocs. v. U.S. Indus.*, 736 F.2d 656 (11th Cir.1984) .............................13

*Walker v. Darby*, 911 F.2d 1573 (11th Cir.1990) .....................................................................6

## Statutes and Regulations

2 U.S.C. § 441f ...........................................................................................................................4

11 C.F.R. § 100.52(d) ................................................................................................................5

11 C.F.R. § 110.4(b) ..................................................................................................................3

11 C.F.R. § 110.4(b)(2)(i) ..........................................................................................................6

11 C.F.R. § 110.4(b)(2)(ii)......................................................................................................5, 6

11 C.F.R. § 111.24(a)(1) (2012) ........................................................................................16, 18

11 C.F.R. § 111.24(a)(2)(i) (2012) ...........................................................................................16

11 C.F.R. § 111.24(a)(2)(ii) (2012) ..........................................................................................16

52 U.S.C. § 30102.......................................................................................................................4

52 U.S.C. § 30104.......................................................................................................................6

52 U.S.C. § 30104(b)(3)(A) ........................................................................................................4

52 U.S.C. § 30109(a)(6)(B) ................................................................................................16, 20

52 U.S.C. § 30109(a)(6)(C) ..........................................................................................5, 16, 17

52 U.S.C. § 30116(a)(1)(A), (f) ..................................................................................................4

52 U.S.C. § 30116(a)(7)(B)(i)...................................................................4

52 U.S.C. § 30118 ...................................................................................4

52 U.S.C. § 30119 ...................................................................................4

52 U.S.C. § 30121 ...................................................................................4

52 U.S.C. § 30122............................................................................. *passim*

**Miscellaneous**

Fed. R. Civ. P. 56..................................................................................1

Fed. R. Civ. P. 56(c) .............................................................................6

Pub. L. No. 107-155, § 315, 116 Stat. 81, 108 (2002).........................5

Civil Monetary Penalties Inflation Adjustments,
  74  Fed. Reg. 31345 (July 1, 2009) .....................................................1

I.      INTRODUCTION

Plaintiff Federal Election Commission ("Commission" or "FEC") hereby moves for summary judgment, pursuant to Federal Rule of Civil Procedure 56.  The extensive record in this case makes clear what happened here.  Sworn testimony and hundreds of pages of contemporaneous documents show that in 2012, former U.S. Congressman David Rivera secretly provided nearly $76,000 in in-kind contributions to the primary election campaign of Justin Lamar Sternad in Florida's 26th Congressional District, in violation of the Federal Election Campaign Act's ("FECA" or "Act") prohibition on contributions made in the name of another. These in-kind contributions were cash payments Rivera made either himself or through his associate Ana Alliegro, to vendors providing services for the Sternad campaign.  The evidence shows that Rivera tried to conceal his identity, but throughout execution of the scheme, Rivera acted as and was perceived by all involved as the principal in charge of all the relevant Sternad campaign activities.  Rivera's goal in orchestrating this scheme was simple:  aid the Sternad campaign in order to boost his own election efforts by having a Democratic candidate oppose his adversary Joe Garcia in Garcia's primary election.  Garcia was the candidate Rivera was likely to — and did — ultimately face in the general election.  After the scheme failed and its details publicly disclosed by the press, Alliegro and Sternad both pled guilty to criminal charges related to their involvement, and Rivera was named in those proceedings as an alleged co-conspirator.

This Court should grant summary judgment in favor of the Commission and impose appropriate remedies against Rivera.  FECA authorizes the award of civil penalties and assessed penalties for the violations here must be not less than 300% of the amount involved in the violation and not more than the greater of $60,000 or 1,000% of the amount involved in the violation.  Here, the Commission respectfully requests that this Court order Rivera to pay a civil

penalty of 700% of the $75,927.31 in contributions he made, a rounded amount of $456,000, because his violations were knowing and willful, and a substantial penalty would vindicate the Commission's authority and deter violations of FECA in the future.  The Commission's requested penalty is also appropriate because Rivera's violations of FECA harmed the public by depriving the electorate of accurate information regarding the source of funding for a campaign's direct mail flyers and increased the risk and appearance of corruption.  The Commission further requests that this Court declare that Rivera knowingly and willfully violated 52 U.S.C. § 30122, and issue a permanent injunction to prevent him from engaging in future similar violations.

## II.      FACTUAL BACKGROUND

David Rivera successfully ran for office as a Florida state legislator multiple times and for Florida's 25th Congressional District in 2010.  *See* FEC's Statement of Material Facts not in Genuine Dispute ("SOF") ¶ 2.  He defeated Democrat Joe Garcia in the general election that year and thus was a United States Congressman from January 2011 through January 2013.  *Id.*  In 2012, Rivera ran for re-election as the Republican candidate to represent Florida's redrawn 26th Congressional District.  *Id*. ¶ 3.  His expected general-election opponent was Garcia, who faced three candidates in the Democratic primary including Justin Lamar Sternad.  *Id*.

During the Democratic primary, Rivera secretly provided nearly $76,000 in funds to vendors providing services for Sternad's campaign in an apparent attempt to oppose and weaken Garcia.  Rivera directed Alliegro to approach Sternad and offer to help with his campaign.  *Id.*¶¶ 5-6.  Alliegro then spent the next few months serving as an intermediary by transmitting funds from Rivera to vendors providing services for Sternad campaign activities.  *Id.* ¶¶ 7-8, 12-19, 22-27, 38-39.  Rivera coordinated and funded the production and distribution of campaign materials for the Sternad campaign while taking steps to conceal his involvement.  *Id.* ¶¶ 4-39.  Alliegro

delivered some of those cash payments to the vendors, while others were delivered by a courier service, and in one instance, Rivera delivered the payment himself. *Id.* ¶¶ 12-19, 22-28, 38-39.

These in-kind contributions to Sternad continued from July through August 2012. *Id.* In the meantime, Sternad falsely reported the contributions as loans from his personal funds to the Sternad campaign committee in multiple FEC reports from May to August 2012, following instructions from Rivera that were conveyed to Alliegro. *Id.* ¶¶ 40-41. Despite the secret mail flyer campaign, Garcia defeated Sternad and two others in the primary election, becoming the Democratic nominee and facing Rivera in the 2012 general election as expected. *Id.* ¶ 3. Garcia defeated Rivera. *Id.*

In 2013 and 2014, Sternad and Alliegro pleaded guilty to criminal charges relating to the mail flyer scheme and served terms of imprisonment. *See* Judgment at 1-2, *United States v. Alliegro*, No. 14-CR-20102 (S.D. Fla. Sept. 10, 2014) (Docket No. 118); Judgment at 1, *United States v. Sternad*, No. 13-CR-20108 (S.D. Fla. July 11, 2014) (Docket No. 43). After his 2013 guilty plea, Sternad filed amended disclosure reports with the FEC attributing the funds at issue to "Unknown Contributors" rather than himself. SOF ¶ 41.

In September 2013, the FEC notified Rivera that it had reason to believe he violated FECA. *Id.* ¶ 42. After an investigation, the Commission unanimously concluded that there was probable cause to believe that Rivera knowingly and willfully violated 52 U.S.C. § 30122 and 11 C.F.R. § 110.4(b). *Id.* ¶¶ 43-44. After attempts to reach a conciliation agreement failed, the Commission filed this lawsuit on July 14, 2017. *Id.* ¶ 45.

## III.   STATUTORY BACKGROUND

FECA requires that the authorized campaign committees of federal candidates have treasurers receive and spend funds, deposit contributions into designated campaign accounts at

depositories, and keep records of contributors.  52 U.S.C. § 30102.  All contributors above a

threshold amount must be identified in publicly filed disclosure reports.  *See* 52 U.S.C. §

30104(b)(3)(A) (requiring campaigns to identify each person contributing "in excess of $200" in

an election cycle).  Candidate committees can accept no contributions from individuals that

aggregate more than a few thousand dollars per election, an inflation-adjusted amount that was

$2500 in 2012.  52 U.S.C. § 30116(a)(1)(A), (f).  Expenditures made "in cooperation,

consultation, or concert, with" a candidate or her campaign "shall be considered to be a

contribution to such candidate."  52 U.S.C. § 30116(a)(7)(B)(i).  Candidate campaigns are not

permitted to accept contributions from a number of sources, including corporations, labor

organizations, government contractors, and foreign nationals.  52 U.S.C. §§ 30118, 30119,

30121.  Disbursements by committees may be made in cash only in amounts of $100 or less.  52

U.S.C. § 30102.

  To make a number of these provisions effective, FECA provides that "[n]o person shall

make a contribution in the name of another person."  52 U.S.C. § 30122 (formerly 2 U.S.C. §

441f).  Without the prohibition, individuals or campaigns could "thwart disclosure requirements

and contribution limits" by attributing contributions to false names or straw donors.  *United*

*States v. O'Donnell*, 608 F.3d 546, 549 (9th Cir. 2010).  False attributions of that type undermine

the government's interests in providing the electorate with "information as to where political

campaign money comes from and how it is spent by the candidate."  *Buckley v. Valeo*, 424 U.S.

1, 66-67 (1976) (per curiam).  Section 30122 ensures that the "true source[s] of contributions

[are] disclosed," *Mariani v. United States*, 212 F.3d 761, 775 (3d Cir. 2000).

  The prohibition on contributions in the name of another also prevents circumvention and

enables detection of violations FECA's source and amount limits on contributions.  *O'Donnell*,

608 F.3d at 549. The ban ensures that donors who have contributed the maximum amount to a candidate do not evading that limit by financing the contributions of others. *FEC v. Rivera*, 333 F.R.D. 282, 286 (S.D. Fla. 2019).  This provision further prevents corporations, unions, government contractors, and foreign nationals from evading FECA's restrictions by contributing in the names of those who are permitted to contribute. *See id.*

Violations of section 30122 are some of the most significant offenses under FECA. Reflecting the importance of the provision, Congress significantly enhanced the potential penalties for knowing and willful violations of the prohibition on conduit contributions in 2002. *See* Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, § 315, 116 Stat. 81, 108 (2002).  Civil penalties for violations of section 30122 are authorized to be five times greater than the penalties for other knowing and willful FECA violations.  *See* 52 U.S.C. § 30109(a)(6)(C).

The type of conduct that section 30122 prohibits includes what are called "false name" contributions, which is defined as "[m]aking a contribution of money or anything of value and attributing as the source of the money or thing of value another person when in fact the contributor is the source."  11 CFR 110.4(b)(2)(ii).  *O'Donnell*, 608 F.3d at 549.  An in-kind contribution is defined as: "[a] contribution of goods, services or property offered free or at less than the usual and normal charge.  The term also includes payments made on behalf of, but not directly to, candidates and political committees (except for independent expenditures or non-coordinated communications)." *See* 11 CFR 100.52(d).  Stated differently, an "in-kind" contribution is simply a contribution of goods, commodities, or services as opposed to a monetary contribution. *See Webster's Third New International Dictionary* 1243 (2002).  The

dollar value of an in-kind contribution is subject to limits and must be reported.  *See* 52 U.S.C. § 30104; 11 CFR 110.4(b)(2)(ii).[1]

## IV.    ARGUMENT

### A.    Summary Judgment Standard

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quoting Fed. R. Civ. P. 56(c)) (internal quotations omitted).  For purposes of summary judgment, a dispute of material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252; *Walker v. Darby,* 911 F.2d 1573, 1576–1577 (11th Cir.1990).  A defendant's bare, unsupported or conclusory assertions cannot defeat summary judgment.  *Fullman v. Graddick,* 739 F.2d 553, 557 (11th Cir.1984) ("[M]ere verification of [a] party's own conclusory allegations is not sufficient to oppose summary judgment . . . .").

### B.    The Undisputed Evidence Establishes That Rivera Violated FECA by Making a Contribution in the Name of Another

There is no genuine issue of material fact regarding Rivera's making of nearly $76,000 in in-kind contributions to the Sternad campaign, through payments to various vendors working on his behalf, in violation of § 30122.  The objective record unmistakably shows that Rivera

---

[1]     A straw-donor or concealed-conduit contribution, when one person provides money to another to make a contribution without disclosing the source of money, is another example of a type of conduct prohibited by section 30122.  11 C.F.R. 110.4(b)(2)(i).

exercised direction and control over the money at issue, made the choice to dedicate the funds to expenditures coordinated with Sternad, and provided the cash used to pay the vendors hand-picked by Rivera, either himself or through Ana Alliegro.  Just as telling, Rivera held himself out as the decision maker for the Sternad campaign, and Alliegro and the vendors sought permission and direction from Rivera to undertake their work.  Rivera was the principal of the scheme to falsify the true source of the contributions to the Sternad campaign as well as the source of the funds, and thereby violated § 30122.

1. **Documentary Evidence and Corroborating Witness Testimony Establishes Rivera's Liability**

First, substantial undisputed documentary evidence and sworn testimony from the vendors, as well as Alliegro and Sternad's own documents and sworn testimony prove Rivera's illegal in-kind contributions to the Sternad campaign.  There were a number of vendors that Rivera directed in this scheme that are relevant for purposes of this motion:  (1) a graphic designer for the Sternad mailers; (2) a company called Expert Printing, used to print the Sternad mailers; and (3) a company called Rapid Mail used for mailing the Sternad mailers to targeted voters.  Rivera hand-picked each of these vendors, all of which he had used in his prior campaigns, and paid them for their services in coordination with Alliegro and Sternad.  Rivera used a fourth vendor who ultimately did not end up being paid, Campaign Data, to provide the addresses for the voters to be targeted when the Sternad mailers were sent.  The detailed business records, contemporaneous correspondence and sworn testimony from the vendors show that Rivera paid the vendors a total of $75,927.31 for their services.

To set the scheme in motion, Rivera first set up a lunch meeting with Ana Alliegro and directed Alliegro to reach out to Sternad to work and provide assistance to the Sternad campaign. SOF ¶ 6.  Another person, Jenny Nillo, was at this meeting and heard Rivera and Alliegro

discussing the Sternad campaign.  *Id*.  Alliegro took this direction, contacted Sternad and immediately began working on his campaign.  *Id.* ¶ 7.  Sternad, although happy to accept the help, expressed worries about funding because he was only a minimum wage hotel clerk and could not afford to fund his campaign himself.  *Id.*  Alliegro promised that he had nothing to worry about, that there was someone that would pay for his qualifying fee and campaign expenses and even find a new job for him should his campaign not be successful.  *See id.*  Throughout the summer of 2012, Rivera's hand-picked vendors provided services to the Sternad campaign and Rivera paid them for their work, and all of them understood that Rivera was controlling the project.  *Id.* ¶¶ 9-37.

A total of $2,600 in cash went to Yolanda Rivas, the graphic designer that designed the Sternad campaign flyers.  *Id.* ¶ 12.  Rivera worked on the flyers himself along with Alliegro and Rivas one busy weekend in July.  When the job was completed, Rivera handed the money to Alliegro, who gave it to Rivas.  *Id*. ¶ 14.  Specifically, Alliegro testified that she "walked down to Congressman Rivera's car and he handed me an envelope which I handed to [Rivas]."  *Id.*[2] Rivas corroborated Alliegro's testimony, including the fact that there was a missing amount that Alliegro returned with in cash later.  *See id.*

Rivera also needed data to target voters with Sternad campaign activities, so he obtained demographic data of Democratic voters from Hugh Cochran's Campaign Data firm.  Rivera emailed Cochran directly in mid-June of 2012 with the subject line "CD 26 Democrat Counts," a reference to the 26th Congressional District for the Democratic primary that Sternad was running

---

[2]      Alliegro's grand jury testimony is properly admissible to establish summary judgment.  *See Arceo v. City of Junction City, Kan*., 182 F. Supp. 2d 1062, 1080 (D. Kan. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

in, and stated "here is the data I wanted to discuss with you. . . Miami-Dade County. . .

Democrats only." *Id.* ¶ 10.  As directed, Cochran emailed counts of demographic data divided

by ethnicity to Rivera; Rivera then sent the data to Alliegro and she forwarded it to Sternad.  *Id.*

When it came time later that summer to collect files of names and addresses of voters to send the

Sternad mailers, Cochran emailed this information directly to Rivera as well.  *Id.*  Cochran

repeatedly referred to the data he collected as "files for his [*i.e.* Rivera's]" mailings, or files "for

Rivera."  *Id.*  Cochran testified that Rivera also asked him to provide this information to John

Borrero of Rapid Mail, and it was only much later that Cochran realized the data was for the

Sternad mailers rather than mailers properly authorized as part of Rivera's own campaign.  *Id.*[3]

Rivera also enlisted Henry Barrios, owner of Expert Printing, to print the mailers that

Yolanda Rivas designed.  Rivera paid $20,430.21 in cash for the first mailers to be printed and

$15,000 in cash for the second round of printed mailers.  *Id.*¶¶ 13, 16-19.[4]  At Rivera's request,

Barrios forwarded the mailer invoices directly to him by email.  *Id.* ¶ 16.  When Barrios became

concerned about an open invoice and when he would be paid, he texted Alliegro, "[p]lease see if

David can pay us."  *Id.* ¶ 17.  Alliegro responded that she "[s]ent it to David yesterday.  He

[Rivera] was looking at the invoices."  *Id.*  Alliegro also told Barrios that he would be paid when

"the big [guy or man] comes from Washington."  *Id.*  As Barrios understood, this was a reference

to Rivera, and it was Rivera's project.  *Id.*

---

[3]     Press reports published at the time highlight Cochran's belief that this was for Rivera's
campaign.  *See, e.g.*, Manny Garcia & Marc Caputo, *Campaign vendors say Republican
Congressman David Rivera funded Democrat's failed primary bid*, Miami Herald  (Aug. 21,
2014, updated Sept. 8, 2014, 6:02 pm) https://www.miamiherald.com/news/politics-
government/article1942132.html.  Rivera's general denials at the time are entirely refuted by the
series of emails between Rivera and Cochran, as explained above.

[4]     Evidence obtained during discovery show the amounts expended to Expert Printing to be
higher than the amounts alleged in the Commission's Amended Complaint.  (Am. Compl. ¶ 13.)

John Borrero of Rapid Mail mailed approximately twelve Sternad mailers on different dates, using the targeted voter data provided by Hugh Cochran.  *Id. ¶¶* 20-37.  The mailers contained not only advocacy in favor of Sternad, but also criticism of Garcia.  *See id. ¶* 37.  One mailer attacked Garcia with allegations that he had "abandoned his wife as she battled cancer."  *See id. ¶* 32.

Alliegro generally delivered Rivera's cash payments for the mailers, but on one occasion after Alliegro's child was apparently in a car accident, Rivera retrieved the payment and delivered it to Borrero's mailbox himself.  *Id. ¶* 28.  In total, Rivera paid more than $37,000 in cash to Rapid Mail for mailing of the Sternad mailers.  *Id. ¶* 37.  Corroborating the testimony from the vendors, Alliegro testified before the grand jury specifically that the cash always came from David Rivera:

> Q: It was always cash that was paid to Rapid Mailing?
> A: That I handled, yes.
> Q: Okay.  Where did the cash come from [to] pay Rapid Mail?
> A: From Congressman David Rivera.
> Q: And where did the cash come from to pay Expert Printing?
> A: From Congressman David Rivera.

*Id. ¶* 23.  The total cash payments to the vendors totaled more than $75,000:

| In-Kind Contribution | Cash Payment |
|---|---|
| Graphic Design Work | $2,600 |
| Printing Costs, First Round to Expert Printing | $20,430.21 |
| Printing Costs, Second Round to Expert Printing | $15,000 |
| Mailer 1 (cash to Rapid Mail) | $2,731.35 |
| Mailer 2 (cash to Rapid Mail) | $2,624.35 |
| Mailer 3 (cash to Rapid Mail) | $2,624.35 |
| Mailer 4 (cash to Rapid Mail) | $2,624.35 |
| Mailer 5 (Cash to Rapid Mail) | $2,624.35 |
| Mailer 6 (Cash to Rapid Mail) | $2,624.35 |
| Second Round Mailing (cash to Rapid Mail) | $22,044 |
| **Total Cash Payments** | **$75,927.31** |

For his part, although he never met Rivera in person, Sternad testified that after his qualifying fees were paid, he mistakenly received along with his own paperwork a Federal Express receipt with the notation for the qualifying fee for David Rivera's Congressional campaign, providing evidence that Rivera had been involved with Alliegro and his campaign.  *Id.* ¶ 11.  And when there were things that needed to be paid for in his campaign, Sternad testified that it was taken care of by "David," "DR," or "the gangster," a nickname Alliegro regularly used for Rivera.  *Id.* ¶ 40.  When it came time to file his disclosure reports with the FEC, at Rivera's direction, Alliegro directed Sternad to falsely report to the FEC that the funds he received for his campaign were a personal loan.  *Id*.  Sternad did not in fact loan his campaign this money and reported it as a loan only because, as he testified, "[t]hat's what I was directed to do."  *Id.*  On the night of the primary election, after finding out he lost, a frustrated Sternad questioned his role in this scheme and texted Alliegro that "[s]ince the object was me to beat Joe then job, etc. not happening…Am I getting something out of all this still."  Exh. 30, Phone Examination Report, at 12.  By the time he was sentenced in his criminal case for his involvement in Rivera's scheme, a remorseful Sternad testified that he "wish[ed] he had never heard the names of Ana Alliegro or David Rivera."  Exh. 42, Transcript of Sentencing, *United States v. Justin Lamar Sternad*, No 13-20108 (S. D. Fla. July 10, 2014) (Docket No. 44 ) at 14:17-18.

Consistent with the instructions from Rivera conveyed by Alliegro to attribute the contributions to another source, Sternad falsely reported having made loans from his personal funds to his campaign committee.  SOF ¶ 40.  In multiple FEC reports from May to August 2012, Sternad falsely stated he had used his own personal funds to loan money to his campaign to pay for the tens of thousands of vendor services paid for by Rivera.  *Id.*  In sum, Rivera provided the cash to pay the vendors, and his conduct throughout the summer of 2012 was

11

consistent with the person in charge of decisions involving the Sternad mailers that everyone believed him to be.  He had final decision-making authority on all aspects of that campaign activity.  *See id.* ¶¶ 12-40.  Alliegro's testimony before the grand jury, her guilty plea, contemporaneous written communications, and testimony from all the recipients of the spending confirm that Rivera came up with the scheme, was the source of the cash for the vendor payments, and directed the decisions.  *See id.*

This series of transactions between Rivera and the vendors is how the contributions in the name of another were effectuated.  Rivera's attempt to conceal these contributions directly violated section 30122, which in turn supports FECA's other provisions limiting contributions and requiring disclosure of who is funding campaigns and political messages.  *See Goland v. U.S.*, 903 F.2d 1247, 1261 (9th Cir. 1990) (explaining that the "Congressional goal furthered by disclosure and reporting was to keep the electorate fully informed of the sources of campaign funding and how the candidate spends the money" and "to gather the data necessary to detect violations of the contribution limits" (citing *Buckley*, 424 U.S. at 67-68).

Courts analyzing violations of section 30122 in similar circumstances have enforced the provision.  *See, e.g.*, *United States v. Smukler*, 330 F. Supp.3d 1050, 1061 (E.D. Pa. 2018) (denying motion to dismiss and finding indictment charge proper); *United States v. Smukler*, No. CR 17-563-02, 2018 WL 3416401, at *3 (E.D. Pa. July 13, 2018) (explaining factual context of a violation where "defendant sent a check for $25,000 [to candidate] and instructed [candidate] to transfer $23,750 from her personal account to the campaign account"); Judgment, *United States*

*v. Smukler*, No. CR 17-563-02 (E.D. Pa. Dec. 7, 2018) (Docket No. 176) (jury verdict finding

defendant guilty of section 30122 violation).[5]

### 2.   **Rivera's Own Statements Further Establish His Liability**

Just as telling as the considerable documentary evidence and sworn testimony from the

vendors that provided services to the Sternad campaign and that of his associate Alliegro,

Rivera's own contemporaneous statements further establish his liability.  Initially, when it was

time to send off Sternad's qualifying paperwork, it was Rivera who arranged to have Sternad's

qualifying fees paid for.  In a recording Alliegro made of this conversation, Rivera told Alliegro

that "everything's ready to qualify him," and Alliegro replied in that same conversation that she

was on her way to Tallahassee to qualify "your [Rivera's] candidate," referring to Sternad.  SOF

¶ 11.

Alliegro and Rivera stayed in direct communication via text and phone throughout the

summer of 2012 about the Sternad campaign activities, with Alliegro regularly seeking direction

from Rivera on payment issues and the campaign's messaging, and Rivera providing that

direction.  *Id.* ¶ 38.  Alliegro had multiple cell phones, including one that she called her "hot"

phone that she told Rivera to use in case Rivera could not reach her.  *See id.*  For example,

Alliegro texted Rivera in July that she was "meeting Yoli [graphic designer Yolanda Rivas]" at

---

[5] In response to the FEC's discovery requests, Rivera produced no documents relating to
the transactions at issue in this case, but did produce an alleged "affidavit" signed by Alliegro
that purports to contradict the factual basis of her guilty plea in her criminal case.  It is unclear if
Rivera intends to rely on this "affidavit."  In any event, it is insufficient to create a dispute of fact
in light of the substantial documentary evidence from herself and witnesses, and Alliegro's own
grand jury testimony, which the "affidavit," does not seek to recant.  It is properly disregarded.
*See, e.g.*, *Van T. Junkins and Assocs. v. U.S. Indus.*, 736 F.2d 656, 657 (11th Cir.1984) (an
affidavit can be disregarded on summary judgment "when a party has given clear answers to
unambiguous questions which negate the existence of any genuine issue of material fact [and that
party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts,
without explanation, previously given clear testimony").

"8am [at] Expert." Exh. 30 at 5. Later, Rivera texted back to "call me." *Id.* In another instance, Alliegro texted Rivera that she had "saved u [Rivera] 1k this week. And much more later," in Rivera's payments to John Borrero. Exh. 35, FBI Miami Division Extraction Report, at 17. Later, Alliegro sought Rivera's direction on how to respond to media inquiries about Sternad's mailers using his middle name "Lamar" and allegations that Sternad was pretending to be African-American, asking Rivera whether any of Sternad's mailers said "we black men." Exh. 30 at 6. She criticized Rivera for not having "inoculated" her against the media, and asked Rivera to provide a written response, which he did. *Id.* at 6-7. This was nearly word-for-word the statement Sternad later provided to the media. *See id.*[6] And on the day that Rivera dropped the cash payment in Borrero's mailbox, *see* SOF ¶ 28, Rivera texted Alliegro throughout the evening about where to find the cash he had provided her to pay Borrero, and confirming that he would do the drop himself. *See* Exh. 30 at 5-6; Exh. 35 at 6. On the night of the primary, Rivera texted Alliegro that he was at a local polling location, but "Lamar is not :(." Exh. 30 at 10. When the primary election was over and the criminal investigation began, Sternad was fired from his job as a hotel clerk. Alliegro texted Rivera that "Lamar got canned call me." Exh. 35 at 26. Rivera told Alliegro that he had "two funeral home jobs available" for Sternad. Exh. 30 at 15.

Equally significant, Rivera's response to all these facts is to now claim absolutely no knowledge of Sternad, no involvement in Sternad's campaign for which he was involved

---

[6]   Around the same time that the media began scrutinizing the Sternad campaign and questioning his disclosure reports, Alliegro texted Rivera that "Joe [Garcia] got mad and called [Miami Herald reporter] [Marc] Caputo." Rivera responded quoting one of Sternad's mailers, "[n]obody reads that thing. All the voters will know is that Lamar will take us far!" and further directed Alliegro to tell Sternad to "just email the statement [to Caputo] and ask him 2 please no longer call him at work." Exh. 30 at 7. *See also* Marc Caputo, "The suspicious campaign of Justin Lamar Sternad, A David Rivera ringer?", Miami Herald (Aug. 4, 2012 11:05 PM) https://miamiherald.typepad.com/nakedpolitics/2012/08/the-suspicious-campaign-of-justin-lamar-sternad-a-david-rivera-ringer.html (quoting Sternad's statement).

throughout the entire summer or 2012, or any association he had with it, and no involvement with Alliegro related to the Sternad campaign.  *See* Exh. 31, David Rivera's Interrogatory Responses (June 26, 2019).[7]  To date, Rivera's only professed acknowledgement is that he and Alliegro were simply friends, and nothing more.  *Id.*  It is well established that these sorts of unsupported statements are insufficient to create a genuine dispute of fact.  *Feldman v. Cutting*, No. 09-14133-CIV, 2009 WL 4021364, at *6 (S.D. Fla. Nov. 19, 2009) ("Such vague and conclusory statements are not sufficient to create a genuine issue of material fact.") (citing *Sun v. Girardot,* 237 Fed. Appx. 415, 417 (11th Cir. 2007) (per curiam) (stating that "conclusory allegations without specific supporting facts have no probative value, and are legally insufficient to defeat summary judgment.")); *see also Solliday v. Fed. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) (contradicted and merely "[c]onclusory, uncorroborated allegations . . . will not create an issue of fact for trial sufficient to defeat a well supported summary judgment motion") (citing *Earley v. Chamption Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)).  Rivera held himself out as the mastermind of this scheme.  He participated in numerous communications, with Alliegro and the vendors, about the services provided on the Sternad campaign.  The vendors repeatedly took direction from Rivera.  Rivera's response to this entire course of conduct is to claim no involvement whatsoever, which fails to create any genuine dispute.  Indeed, it is important to grant summary judgment in cases such as this one, otherwise FECA could far too readily be abused by persons who deny that they are the true source of the contributions.  Accordingly, in light of this considerable evidence, Rivera's mere denial that he made contributions to the

---

[7] As noted in the FEC's Reply in Support of its Motion for Sanctions (Document No. 141), on August 7, 2020 (one business day before the summary judgment deadline), the FEC was finally able to take Rivera's deposition.  As will be explained once the transcript from this deposition is available, none of Rivera's statements are sufficient to create a genuine issue of fact to preclude granting the FEC summary judgment.

Sternad campaign is insufficient to create a genuine issue of material fact.  *Anderson*, 477 U.S. at 248; *see also Buckrem v. Dunphy*, No. 4:06CV429-WS/WCS, 2006 WL 8443533, at *1 (N.D. Fla. Dec. 20, 2006) (party "may not rely upon the 'mere allegation or denials' in the pleadings in opposing summary judgment").  Summary judgment should be awarded to the Commission.  *See United States v. Danielczyk*, 788 F. Supp. 2d 472 (E.D. Va. 2011) (finding violation of section 30122 on summary judgment where there is no genuine dispute of material fact).

## V.     THIS COURT SHOULD ORDER A CIVIL PENALTY AND INJUNCTIVE RELIEF

### A.     Rivera Should Pay a Significant Civil Penalty

For 2012 FECA violations, the statute authorizes this Court to award a civil penalty which does not exceed the greater of $7,500 for each violation or an amount equal to any contribution or expenditure involved in such violation. 11 C.F.R. § 111.24(a)(1) (2012) (providing the amount applicable under 52 U.S.C. § 30109(a)(6)(B) as adjusted by inflation pursuant to statute); *see* FEC, Civil Monetary Penalties Inflation Adjustments, 74 Fed. Reg. 31345 (July 1, 2009).  Congress provided for enhanced civil penalties for "knowing and willful" violations.  *See* 52 U.S.C. § 30109(a)(6)(C).  If a civil penalty is imposed for 2012 "knowing and willful" violations of the prohibition on making contributions in the name of another, the civil penalties "shall not be less than 300% of the amount of any contribution involved in the violation, and shall not exceed the greater of $60,000 or 1000% of the amount of any contribution involved in the violation."  11 C.F.R. § 111.24(a)(2)(ii) (2012) (providing the amount applicable under 52 U.S.C. § 30109(a)(6)(C) as adjusted by inflation pursuant to statute).

Rivera knowingly and willfully made $75,927.31 in contributions in the name of another and therefore, if determined by the amount in violation, FECA authorizes this Court to impose a maximum penalty of $759, 273.10.  *See* 52 U.S.C. § 30109(a)(6)(C); 11 C.F.R. § 111.24(a)(2)(i)

16

(2012).  This Court has wide discretion to determine an appropriate civil penalty.  *FEC v. Furgatch*, 869 F.2d 1256, 1258 (9th Cir. 1989); *FEC v. Craig for U.S. Senate*, 70 F. Supp. 3d 82, 96 (D.D.C. 2014), *aff'd*, 816 F.3d 829 (D.C. Cir. 2016).  In exercising its discretion, the Court should consider: (1) the good or bad faith of the defendant; (2) the injury to the public; (3) the defendant's ability to pay; and (4) the necessity of vindicating the authority of the FEC and the penalty's deterrent effect.  *Furgatch*, 869 F.2d at 1258; *FEC v. O'Donnell*, 15-cv-17, 2017 WL 1404387, at *2 (D. Del. Apr. 19, 2017) (unpublished); *Craig*, 70 F. Supp. 3d at 100; *FEC v. Comm. of 100 Democrats*, 844 F. Supp. 1, 7 (D.D.C. 1993).  For the reasons set forth below, in this case these factors weigh in favor of awarding a penalty of $456,000, a rounded 700% of the amount at issue in Rivera's violations of the ban on contributions in the name of another.

### 1.    Rivera's Violations Were Knowing and Willful

An important factor in determining an appropriate penalty is whether Rivera acted in good or bad faith.  *See Furgatch*, 869 F.2d at 1258.  Rivera's knowing and willful violations reflect his bad faith, and they authorize this Court to assess the enhanced penalties provided for under FECA.  *See* 52 U.S.C. § 30109(a)(6)(C); *see also Furgatch*, 869 F.2d at 1259 (considering a defendant's lack of good faith as "indicative of the need for a large penalty to deter future wrongdoing.").  A violation of FECA is knowing and willful if the "acts were committed with full knowledge of all the relevant facts and a recognition that the action is prohibited by law." 122 Cong. Rec. 12,197, 12,199 (May 3, 1976). This does not require the Commission to prove that Rivera was aware of the specific statutory provisions that he violated.  *United States v. Whittemore*, 944 F. Supp. 2d 1003, 1007 (D. Nev. 2013), *aff'd*, 776 F.3d 1074 (9th Cir. 2015); *Danielczyk*, 788 F. Supp. 2d at 491.

17

Instead, it is sufficient for the Commission to establish that Rivera "[did] not act through ignorance, mistake, or accident," and that he "acted with knowledge that some part of his course of conduct was unlawful and with the intent to do something the law forbids." *U.S. v. Whittemore*, 776 F.3d 1074, 1080-81 (9th Cir. 2015) (internal quotation marks omitted); *see also Danielczyk*, 788 F. Supp. 2d at 491 (finding that the Government must prove that defendants "intended to violate the law" but did not need to prove their "awareness of the specific law's commands.").

The knowing and willful standard is clearly established in this case.  Rivera had run for office five previous times, including federal office, and was well aware of the commonly understood requirements that contributions to a campaign be accurately disclosed to the public. Rivera's elaborate scheme to conceal his identity as the source of cash payments to vendors for the Sternad campaign show that he was aware that his actions were unlawful.  *See United States v. Hopkins*, 916 F.2d 207, 214-15 (5th Cir. 1990).  *See also* SOF ¶¶ 4-40.  And Rivera's use of cash for the contributions, a manner of vendor payment impermissible by the Sternad campaign, shows his intention to avoid generating a paper trail and that he was acting in bad faith.  *See id.*[8]

## 2.    **Rivera's Violations Injured the Public**

In determining an appropriate penalty, this Court should also consider the injury to the public as a result of Rivera's violations of FECA.  *Furgatch*, 869 F.2d at 1258. "'[T]here is

---

[8]       Rivera may contend that he was unaware that his conduct was unlawful, a contention belied by his years of experience with campaign finance.  Even assuming that Rivera could establish that he was unaware of the illegality of such conduct, however, that finding would merely lead to a different permitted calculation for a civil penalty, not a finding that he committed no violation.  Under the penalty formula for violations not found to be knowing and willful, the Court has discretion to award a civil penalty not to exceed the greater of $7,500 for each violation (a total of $75,000 for each of the ten payments in violation) or $75,927.31, the amount of the contributions  involved.  11 C.F.R. § 111.24(a)(1) (2012).

always harm to the public when FECA is violated.'" *Craig*, 70 F. Supp. 3d at 99 (quoting *FEC v. Am. Fed'n of State, Cnty. and Mun. Emps. - P.E.O.P.L.E. Qualified*, 88-cv-3208, 1991 WL 241892, at \*2 (D.D.C. Oct. 31, 1991).  Here, Rivera's contributions harmed the public because the electorate was deprived of accurate information regarding the true source of Rivera's contributions to the Sternad campaign.  *See Buckley*, 424 U.S. at 67; *O'Donnell*, 608 F.3d at 553-54.  Indeed, the voting public received flyers attacking Rivera's general-election opponent as having abandoned a cancer-stricken wife and other mailers while being deprived of the information that Rivera was the financer of those allegations.  SOF ¶ 36.  As the Supreme Court has recognized, avoiding even the appearance of corruption is "critical" to prevent erosion of the public's "confidence in the system of representative Government."  *Buckley*, 424 U.S at 27; *see also McCutcheon v. FEC*, 572 U.S. 185, 199 (2014) (recognizing a compelling interest in preventing quid pro quo corruption or its appearance).

### 3.   **Rivera's Ability to Pay**

In determining the amount of the penalty, this Court should also consider Rivera's ability to pay.  *Furgatch*, 869 F.2d at 1258.  Here, the Commission has requested a penalty that is less than the maximum authorized by FECA, 700% of the amount in violation rather than the 1,000% authorized under the statute for knowing and willful violations of the ban on contributions in the name of another.  To date, Rivera has not presented any evidence demonstrating that he is unable to pay, nor could he in light of the net worth he has publicly sworn to.  *See* Exh. 34 (filing with Florida Secretary of State showing $1.5 million net worth).  Indeed, in a recent complaint filed against David Rivera's company in a breach of contract action alleges that he was paid $15 million pursuant to a $50 million contract signed in 2017 with the U.S. subsidiary of Venezuela's state-run oil-company for "consulting services."  *See* Compl., *PDV USA Inc. v. Interamerican*

*Consulting, Inc.*, No. 1:20-cv-3699 (S.D.N.Y. May 13, 2020).  All of these facts weigh in favor of a finding that the Commission's requested penalty against Rivera is appropriate here.

> **B.      This Court Should Declare That Rivera Violated 52 U.S.C. §30122 and Enjoin Rivera from Committing Future Violations**

The Commission also respectfully requests that the Court declare that Rivera violated 52 U.S.C. §30122, and permanently enjoin him from violating this provision again.  52 U.S.C. § 30109(a)(6)(B).  An injunction is appropriate where, as here, there is a likelihood of future violations.  *Furgatch*, 869 F.2d at 1262.  Rivera's concealment of his identity shows awareness that his conduct was unlawful and that there is a danger that his conduct will occur again.  *See* SOF ¶¶ 4-40.  He has continued to run for public office.[9]  And Rivera's continued refusal to take responsibility for his actions indicates he is likely to commit future violations.  *See Furgatch*, 869 F.2d at 1262 ("[a] defendant's persistence in claiming that (and acting as if) his conduct is blameless is an important factor in deciding whether future violations are sufficiently likely to warrant an injunction."); *see also O'Donnell*, 2017 WL 1404387, at \*5 (imposing a permanent injunction to prevent future violations); *Comm. of 100 Democrats*, 844 F. Supp. at 8 (same).

## CONCLUSION

For the foregoing reasons, this Court should (1) grant summary judgment in favor of the Commission; (2) declare that Rivera violated 52 U.S.C. §30122; (3) award a penalty of $456,000; and (4) issue a permanent injunction.

---

[9]      In March 2017, Rivera filed to run as a candidate in 2018 for Florida's 105th House District.  (Am. Compl. ¶ 6; Ans. ¶ 6.)  He made $260,000 in contributions to his own campaign, loaned the campaign $150,000, and received contributions from others totaling $254,900.  (Exh. 1, Fla. Div. of Elections, Contribution Query Results, 2018 Election.)

Respectfully submitted,

Lisa J. Stevenson (Special Bar No.            /s/ Greg J. Mueller
  A5502354)                                   Greg J. Mueller (Special Bar No. A5502376)
Acting General Counsel                        Attorney
lstevenson@fec.gov                            gmueller@fec.gov

Kevin Deeley (Special Bar No. A5502355)       /s/ Shaina Ward
Associate General Counsel                     Shaina Ward (Special Bar No. A5502563)
kdeeley@fec.gov                               Attorney
                                              sward@fec.gov

                                              FOR THE PLAINTIFF
August 10, 2020                               FEDERAL ELECTION COMMISSION
                                              1050 First Street, NE
                                              Washington, D.C.  20463
                                              (202) 694-1650

**CERTIFICATE OF SERVICE**

I, Greg J. Mueller, counsel of record in this case, certify that on August 10, 2020, I electronically filed plaintiff Federal Election Commission's Motion for Summary Judgment, Statement of Material Facts not in Genuine Dispute, the Declarations in support thereof and the Exhibits attached thereto, the Memorandum of Law and a Proposed Order with the Clerk of the United States District Court for the Southern District of Florida by using the Court's CM/ECF system, which sent notification of such filing to the following:

Roy J. Kahn, Esq.
rjk@roykahnlaw.com
*Counsel for Defendant David Rivera*

/s/ Greg J. Mueller
Greg J. Mueller (Special Bar No. A5502376)
Attorney
gmueller@fec.gov