UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

### Case No. 17-22643-Civ-COOKE/GOODMAN

FEDERAL ELECTION COMMISSION,

     Plaintiff,

v.

DAVID RIVERA,

     Defendant.

_____/

### ORDER GRANTING PLAINTIFF FEDERAL ELECTION COMMISSION'S MOTION FOR SUMMARY JUDGMENT

**THIS MATTER** is before the Court upon Plaintiff Federal Election Commission's Motion for Summary Judgment (the "Motion") (ECF No. 142), filed August 10, 2020. Defendant David Rivera ("Rivera") filed his response in opposition to the Motion on August 22, 2020. ECF No. 146. Plaintiff Federal Election Commission ("FEC" or "the FEC") filed its reply in support of the Motion on August 31, 2020. ECF No. 153. Accordingly, the Motion is ripe for adjudication.

### BACKGROUND

This case stems from campaign funds related to a 2012 political campaign for a U.S. congressional seat. Rivera was a United States Congressman representing Florida's 25th Congressional District from January 2011 through January 2013. ECF No. 1 at ¶ 6. In 2012, Rivera unsuccessfully ran for re-election as the Republican candidate to represent Florida's redrawn 26th Congressional District. *Id.* Rivera lost that election to Democrat Joe Garcia ("Garcia"). *Id.* at ¶ 12. Garcia became the Democratic nominee in the 2012 general election after defeating three other candidates in the Democratic primary, including Justin Lemar Sternad ("Sternad"). *Id.*

The FEC alleges that during the Democratic primary, Rivera executed a scheme to secretly provide funds to Sternad's campaign to weaken Garcia, who was likely to be Rivera's general election opponent. *Id.* at ¶¶ 1, 26. In April 2012, Rivera initiated the scheme when he met with his associate, Ana Sol Alliegro ("Alliegro"), and directed her to approach Sternad

with an offer to provide financial support to his primary campaign. *Id.* at ¶¶ 14-15. Alliegro did so, and Sternad accepted the offer. *Id.* ¶ 15. At Rivera's supposed direction, Alliegro then spent the next few months acting as an intermediary, transmitting funds to Sternad, the Sternad Committee, and the vendors providing services to that Committee. *Id.*

Rivera moved to dismiss the initial complaint on November 22, 2017. This Court granted Rivera's motion on September 27, 2018. In granting Rivera's motion, the Court followed *Federal Election Comm'n v. Swallow*, 304 F. Supp. 3d 1113, 1115 (D. Utah 2018) where the District of Utah determined that Congress did not intend to create secondary liability for "helping and assisting" in making a contribution in the name of another when it enacted the Federal Election Campaign Act, and dismissed the case. *Swallow*, 2018 WL 1725429, at *4. In *Swallow*, the court also enjoined the FEC from enforcing § 110.4(b)(1)(iii) and ordered that § 110.4(b)(1)(iii) be stricken from the Code of Federal Regulations.[1] *Id. Swallow* was fatal to the FEC's claim against Rivera because the initial complaint's sole claim for relief – titled "First Cause of Action" – unambiguously stated that it arose under § 110.4(b)(1)(iii). Consequently, the court dismissed the initial complaint.

The FEC filed an Amended Complaint on January 15, 2019, which is the operative pleading in this action. The Amended Complaint essentially asserts the same factual allegations as the initial complaint. *See generally*; Am. Compl. Importantly, however, the Amended Complaint does not claim that Rivera violated § 110.4(b)(1)(iii). Nor does the Amended Complaint seek relief under § 110.4(b)(1)(iii). Instead, the Amended Complaint's sole cause of action asserts that "Defendant David Rivera knowingly and willfully violated 52 U.S.C. § 30122; 11 C.F.R. § 110.4(b)(1)(i) (same), by making contributions in the name of others to Justin Lamar Sternad's 2012 primary campaign in Florida's 26th U.S. Congressional District." ECF No. 41 at ¶ 35. Likewise, in the Amended Complaint's prayer for relief the FEC seeks a declaration that Rivera knowingly and willfully violated 52 U.S.C. § 30122; 11 C.F.R. § 110.4(b)(1)(i) by making more than $55,601 in contributions in the name of another. *Id.* at ¶ A, p. 9. Rivera moved to dismiss the Amended Complaint on February 1, 2019. The

---

[1] Because it did not appear that the FEC appealed the decision in *Swallow*, *see* Docket Sheet, *Federal Election Comm'n v. Swallow*, No. 2:15-cv-439-DB (D. Utah 2018), the injunction remained in place.

Court denied Rivera's motion after holding a hearing on the same. *See* ECF Nos. 48 and 49. Accordingly, the Amended Complaint is the operative pleading in this action.

APPLICABLE LEGAL STANDARDS

**I.     SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A district court must grant a motion for summary judgment only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Essex Ins. Co. v. Barrett Moving & Storage, Inc.*, 885 F.3d 1292, 1299 (11th Cir. 2018). An issue is "genuine" if a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the nonmoving party in light of her burden of proof. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). Similarly, a fact is "material" if, "under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "[W]here the material facts are undisputed and do not support a reasonable inference in favor of the non-movant, summary judgment may properly be granted as a matter of law." *DA Realty Holdings, LLC v. Tenn. Land Consultants*, 631 F. App'x 817, 820 (11th Cir. 2015).

Moreover, the moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact to be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Once the moving party has met its burden, the burden of production shifts to the nonmoving party 'to go beyond the pleadings and by [their] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, ***designate specific facts*** showing that there is a genuine issue for trial.'" *Ponders v. United States*, 13-22876-CIV, 2014 WL 2612315, at *2 (S.D. Fla. June 11, 2014) (quoting *Celotex*, 477 U.S. at 324) (emphasis added). Thus, "the nonmoving party must demonstrate more than a mere scintilla of evidence; if the nonmoving party's evidence is 'merely colorable, or is not significantly probative, summary judgment may be granted.'" *Ponders*, 2014 WL 2612315, at *2 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–52 (1986)).

## II.   THE FEDERAL ELECTION CAMPAIGN ACT

Congress passed the Federal Election Campaign Act ("FECA") in 1971. 52 U.S.C. §§ 30101-46. Section 30122 of FECA states as follows:

> No person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution, and no person shall knowingly accept a contribution made by one person in the name of another person.

52 U.S.C. § 30122. In 1976, the FEC promulgated a regulation regarding FECA's ban on contributions made in the name of another, which made specific reference to the two most common forms of such contributions: false name and conduit contributors. 11 C.F.R. § 110.4(b). A false name contribution occurs when a person contributes to a candidate but falsely attributes another person as the source of the contribution; meanwhile, a conduit contribution reaches the same result when a person provides funds to another person (the conduit) who then contributes the funds to the candidate. *Swallow*, 304 F. Supp. 3d at 1114-15. Additionally, FECA further limits the dollar amounts and permissible sources of contributions to candidates for federal office, political parties, and political committees. 52 U.S.C. §§ 30116(A), 30118-19, 30121.

### ANALYSIS

In its Motion, the FEC contends that it is entitled to summary judgment because: 1) the documentary evidence and corroborating witness testimony establishes that Rivera made illegal in-kind contributions to the Sternad campaign; and 2) Rivera's own statements further establish his liability. In response to the FEC's Motion, Rivera argues, in his astoundingly concise (7-page) opposition brief, that this Court should deny FEC's summary judgment motion because the only evidence provided by FEC that "seeks to directly establish" Rivera's violation of 52 U.S.C. § 30122 is Alliegro's grand jury testimony and the factual proffer that Alliegro provided at her change of plea hearing. According to Rivera, the problem with that testimony is two-fold: 1) Alliegro purportedly repudiated that testimony; and 2) that testimony should be disregarded because Alliegro purportedly "has not been available for deposition and has not provided the parties any reason to believe that she would be available to testify consistent with the information contained in her grand jury testimony or at the time she pled guilty." ECF No. 146 at p. 3.

Rivera goes on to argue that Alliegro's grand jury and plea colloquy testimony are

"blatant hearsay statements and would not be admissible at trial without the declarant being available for cross-examination." *Id.* p. 4. Rivera also suggests that "Ms. Alliegro, in subsequent sworn testimony, contends that her 'cooperation' [in the grand jury proceedings] was coerced and not voluntary." *Id.* at p. 5.

As discussed below, Rivera's arguments lack merit. Moreover, when reviewed as a whole, the record evidence quite obviously paints a picture showing that Rivera engaged in a scheme to unlawfully fund the Sternad campaign. And Rivera's opposition brief fails to rebut or even address much of that evidence.

### I.   THE COURT CAN PROPERLY CONSIDER ALLIEGRO'S GRAND JURY AND PLEA COLLOQUY TESTIMONY AT SUMMARY JUDGMENT

#### A.   ALLIEGRO DID NOT REPUDIATE HER PRIOR TESTIMONY THROUGH HER FEBRUARY 14, 2019 DECLARATION

As previously discussed, Rivera argues that the Court cannot consider Alliegro's grand jury testimony nor her plea colloquy testimony in resolving FEC's Summary Judgment Motion because Alliegro purportedly "has not been available for deposition and has not provided the parties any reason to believe that she would be available to testify consistent with the information contained in her grand jury testimony or at the time that she pled guilty." ECF No. 146 at p. 3. Unfortunately for Rivera, on summary judgment, simply stating that a witness has not been available for deposition, without more, does not bar this Court from considering that witness's prior testimony. Likewise, at summary judgment, it is not within the Court's purview to exclude testimony because a witness has not purportedly given "the parties reason to believe that she would be available to testify consistent" with her prior testimony.

As an initial matter, the Court finds it odd that Rivera claims that Alliegro repudiated her grand jury testimony as well as the statements she made at her plea colloquy, yet Rivera fails to cite to the Declaration in which Alliegro purportedly repudiated that sworn testimony. Nonetheless, the Court has reviewed the very brief Declaration, which in its entirety states as follows:

I, Ana Sol Alliegro, swear and depose as follows:

1. I reside in Miami; Florida, and I make this based on my personal knowledge.

2. I have read the Amended Complaint submitted by the Federal Elections Commission (FEC) on January 15, 2019, in the matter of Federal Elections Commission v. David Rivera, which makes reference to me in several paragraphs; including the following:

3. In paragraph 14 of the FEC's Amended Complaint, the FEC alleges: "Rivera directed Alliegro to approach Sterned with an offer of Rivera helping to fund Sternad's campaign."

4. In paragraph 15 of the FEC's Amended Complaint, the FEC alleges: on or about April 24, 2012, Alliegro spoke with Sternad and offered to transmit Rivera's funds to Sternad's campaign to which Sternad agreed.

5. In paragraph 20 of the FEC's Amended Complaint, the FEC alleges: "Following instructions from Rivera that were conveyed by Alliegro, Sternad falsely reported the contributions as loans from his personal fund to the Sternad Committee."

6. On June 15, 2017, I filed a complaint with the Florida Bar detailing previously coerced statements relating to the allegations in the FEC's Amended Complaint.

7. As With the other allegations involving me in the FEC's Amended Complaint, each of the above-referenced allegations by the FEC in its Amended Complaint are patently false.

I declare under penalty of perjury that this declaration is true and correct.

ECF No. 147, Ex. G. Alliegro's Declaration is rife with vague and ambiguous assertions, and it does not contain *any* specific facts. To be clear, the Declaration does not specifically identify what or how the allegations in the Amended Complaint are "patently false". Nor does it identify what statements were purportedly coerced.

After reviewing Alliegro's Declaration, the Court now fully understands why Rivera did not cite to it. Put quite simply, the one-page Declaration does not state what Rivera contends that it states. The Declaration does not even mention Alliegro's grand jury testimony. Nor does it mention her plea colloquy. As such, the Court finds that there is no basis for it to construe Alliegro's Declaration to be a repudiation of her grand jury testimony and plea colloquy that she gave in criminal court, under penalty of perjury, five years before the Declaration here was purportedly executed. This is especially true given that Alliegro has not revoked her plea agreement with the United States, nor has she appealed her guilty verdict

in her underlying criminal case. *See United States v. Ana Alliegro*, Case No. 14-20102-CR-Scola. Indeed, it seems that the Declaration was carefully crafted to focus on the FEC's Amended Complaint as opposed to the grand jury and plea colloquy testimony to avoid potential perjury charges or other additional criminal charges against Alliegro. But, unfortunately for Rivera, Alliegro cannot have it both ways. She cannot repudiate her prior testimony, given under penalty of perjury during a criminal proceeding, without actually repudiating that testimony. Meaning that in order to revoke her prior testimony Alliegro would have to specify what exactly she is repudiating in her grand jury and plea colloquy testimony as opposed to making vague general references regarding the allegations in the Amended Complaint. To suggest otherwise is disingenuous and illogical. If the Court followed Rivera's logic, then the Court would have to rely upon general statements in Alliegro's one-page Declaration to infer that the entirety of her multiple pages of grand jury and plea colloquy testimony from the underlying criminal cases was repudiated by an ambiguous single-paged Declaration created approximately *five years after* her prior testimony. This the Court is unwilling to do.

### B. ALLIEGRO DID NOT REPUDIATE HER PRIOR TESTIMONY THROUGH HER FLORIDA BAR COMPLAINT AGAINST THE ASSISTANT U.S. ATTORNEY THAT PROSECUTED HER

As previously mentioned, in her Declaration, Alliegro vaguely refers to a Florida Bar Complaint (the "Bar Complaint") concerning purportedly "coerced" statements she made in the underlying criminal cases. Rivera's reliance upon the Alliegro Declaration's reference to the Bar Complaint against Assistant U.S. Attorney Thomas Mulvihill is both misleading and disingenuous. It is misleading and disingenuous, in part, because, like the other allegations in Alliegro's Declaration, the statements related to the Bar Complaint do not actually repudiate Alliegro's prior testimony. Again, the statements related to the Bar Complaint are couched in terms of the Amended Complaint not Alliegro's grand jury and plea colloquy testimony. The disingenuous and misleading nature of Alliegro's statements concerning the Bar Complaint are further evidenced by the fact that Rivera neglected to inform the Court that the Florida Bar threw out the Bar Complaint *prior* to the filing of Rivera's opposition brief (and *prior* to the date Alliegro purportedly signed her Declaration). ECF No. 153, Ex. 43. At best, such a failure was inadvertent and shows a lack of professional diligence. At worst, the failure was intentional and displays a lack of candor to the Court. Either way, counsel had a responsibility to, at least, advise the Court of the Florida Bar's dismissal of the Bar Complaint. The scenario

presented here is no different than a scenario in which a party urges the Court to rely upon an overturned judicial opinion without advising the Court that said decision was overturned. As such, counsel for Rivera is advised to refrain from such conduct in the future.

Despite the fact that Alliegro's Bar Complaint was dismissed prior to the filing of Rivera's opposition brief, the Court has reviewed the Bar Complaint and has determined that, like Alliegro's Declaration, the Bar Complaint relies upon ambiguous, generic, and conclusory allegations that lack sufficient specificity to repudiate Alliegro's grand jury and plea colloquy testimony. For the sake of brevity, the Court will not enumerate and analyze each instance that supports this conclusion; however, the Court will point out a few examples to provide clarity. One such example relates to Alliegro's suggestions in the Bar Complaint that her grand jury testimony was purportedly "coerced" or "involuntary". For instance, the Bar Complaint states:

> [o]n December 18th, 2014, in accordance with my ***coerced involuntary plea agreement***, I testified before a federal grand jury in Fort Lauderdale, Florida in the presence of Mr. Mulvihill. My legal counsel was outside the grand jury room waiting for me to conclude my testimony. Mr. Mulvihill had spoken to my counsel prior to entering the grand jury room and was aware that my counsel was waiting for me outside the grand jury room. At the conclusion of my testimony inside the grand jury room, Mr. Mulvihill escorted me to a connected grand jury ante room. For over twenty minutes, Mr. Mulvihill proceeded to discuss grand jury subject matter with me and made several attempts ***to coerce further involuntary testimony***. When Mr. Mulvihill finally allowed me to leave the ante room, I reported this inappropriate communication to my counsel.

ECF No. 147-5, Ex. E at p. 7 (emphasis added). *See also id.* at pp. 8-9 (asserting additional conclusory and ambiguous allegations of coercion). The problem with these assertions is that they do not specify what about Alliegro's grand jury testimony was purportedly coerced. Nor did Alliegro indicate in her Bar Complaint what specific statements in her grand jury testimony were purportedly false. The transcript of Alliegro's grand jury testimony is forty-five pages in length; ambiguous, conclusory, and generic assertions in a Bar Complaint that the Florida Bar already dismissed before the opposition brief was even filed are insufficient to repudiate such grand jury testimony.

Furthermore, Alliegro's statements during her plea colloquy directly undermine her newly asserted claims of coercion. To be clear, the transcript of

Alliegro's plea colloquy, in pertinent part, reflects that U.S. District Judge Robert N. Scola had the following conversation with Alliegro:

> Judge Scola: All right. And prior to today, have you received a copy of the Indictment which is the formal charging document that sets forth the charges against you?

> Alliegro: Yes.

> Judge Scola: Have you had a chance to speak to your attorneys about those charges, about, in general, what type of evidence the Government may have against you and about any possible defenses you may have in the case?

> Alliegro: Yes.

> Judge Scola: Have you also spoken to them about the decision whether to plead guilty or go to trial?

> Alliegro: Yes.

> Judge Scola: Are you fully satisfied with the representation and advice that has been provided to you by your attorneys?

> Alliegro: Yes.

> Judge Scola: Is there anything concerning their representation or advice that you are not satisfied with?

> Alliegro: No.

> [. . .]

> Judge Scola: Other than what was announced in open court a few minutes ago, have any additional promises been made to you in order to get you to plead guilty today?

> Alliegro: No, sir.

> Judge Scola: Has anybody forced you, threatened you or coerced you in any way to get you to plead guilty?

> Alliegro: No.

> Judge Scola: Are you pleading guilty of your own free will because you are guilty?

Alliegro: Yes.

FEC Mot. Summ. J., Ex. 25, ECF No. 142-28, at 7-10 (11:05:50-11:06:33 and 11:08:27-11:08:47). Thus, Judge Scola provided Alliegro with multiple opportunities to advise him that she was purportedly coerced or forced into pleading guilty or even that she was unsatisfied with the legal representation that she received; however, Alliegro made no mention of coercion. Nor did she advise Judge Scola that she was not satisfied with her counsel. Instead, Alliegro confirmed just the opposite. She also confirmed that she pled guilty of her own free will because she was guilty. This directly contradicts Alliegro's Bar Complaint.

Likewise, Alliegro's grand jury testimony directly contradicts the Bar Complaint's allegations that she was purportedly coerced into pleading guilty. The relevant grand jury testimony in question was as follows:

Q.    Now, you talked to – your lawyers were present when you decided to plead guilty, correct?

A.    Yes.

Q.    Was agent Vance present when you decided to plead guilty?

A.    Yes, he was.

Q.    Was I also present then?

A.    Yes, you were.

Q.    And you had agreed to plead guilty and take your chances with the judge, correct?

A.    Correct.

Q.    You were not promised anything for pleading guilty?

A.    No, I was not. In fact, I did a lot of time before I even pleaded guilty so, no, I was not promised anything by you or the government or anyone else.

Q.    And actually, at your sentencing I actually recommended more time, didn't I?

A.    Yes, you did.

> Q.      But the judge gave you less?
>
> A.      Thank you, Judge Scola. He didn't give me less time. He just let me spend it at home. He did still give me a year. Tom, you still asked for that whole year in jail, in a maximum federal penitentiary.

FEC Mot. Summ. J., Ex. 2, ECF No. 142-2, at 45-46. Accordingly, Alliegro unequivocally testified, in a very detailed manner, that she was not promised anything for pleading guilty. Nor did she indicate that her guilty plea was involuntary.

In her Bar Complaint, Alliegro also claims that Assistant U.S. Attorney Thomas Mulvihill gave false testimony at her pretrial detention hearing concerning her travel to Colombia and Nicaragua and that purportedly false testimony resulted in Alliegro being denied pretrial release; however, a review of the transcript of Alliegro's pretrial detention hearing reveals that Alliegro's assertions, once again, are not accurate. More specifically, in granting the Government's motion to deny Alliegro pretrial release, U.S. Magistrate Judge Alicia M. Otazo-Reyes stated:

> I note that the government is traveling under risk of flight, and the burden on the government for that is preponderance of the evidence. I note that the defendant left once and then left again. That's twice. The first time around she did not show up for an appointment. The second time around, after turning over a passport used the convenience of a Grey Hound bus to get across the border and travel to Nicaragua. I think that those facts together with the strength of the evidence against the defendant make a finding of preponderance of the evidence that she presents a risk of flight; one that this court can comfortably make, and for that reason the court will grant the motion. I do note that the conversations regarding the potential exposure are not appropriate before this court. That is a decision that goes to Judge Scola, although I do take that into account in terms of assessing the risk of flight. In this case we have actual departure from this country on two occasions. So I don't need to guess what Judge Scola's sentence would be.

Transcript of Pretrial Detention Hearing, at 40-42, *United States v. Ana Alliegro*, Case No. 14-CR-20102-SCOLA/OTAZO-REYES (S.D. Fla. April 11, 2014), ECF No. 34.[2]

---

[2] The Court notes that the transcript of Alliegro's Pretrial Detention Hearing was not filed in this case; however, the Court, on its own initiative, takes judicial notice of the Pretrial Detention Hearing Transcript. *See Philippeaux v. City of Coral Springs*, 19-60617-CIV, 2020 WL 2846531, at *2 (S.D. Fla. June 2, 2020) (taking judicial notice of state court transcripts and stating "[t]he Court may take judicial notice of the transcript because it is a public record."); *see also Herrera v. Bank of Am., N.A.*, 15-CV-62156, 2016 WL 4542105, at *1 (S.D. Fla. Aug. 31, 2016) (recognizing that "[t]he Court may judicially notice a fact when it 'can be accurately

Thus, at Alliegro's pretrial detention hearing, Judge Otazo-Reyes expressly held that she was granting the Government's motion to detain Alliegro until her trial due to the fact that Alliegro fled the United States on two separate occasions under circumstances that provided sufficient evidence that Alliegro posed a flight risk. Additionally, it should be noted that Alliegro was represented by counsel at the pretrial detention hearing and said counsel was afforded an opportunity to cross examine the Government's witnesses (which counsel declined, *id.* at 17) as well as to challenge the findings contained within the pretrial services report (which counsel did challenge, *see, e.g. id.* at 25).

Similarly, Alliegro's grand jury testimony undermines her Bar Complaint's allegations that she was coerced into testifying before the grand jury. More specifically, that grand jury testimony states:

Q.    Ms. Alliegro, are you here pursuant to a grand jury subpoena that was served upon you?

A.    Yes, sir, I am.

Q.    Are you represented by a lawyer?

A.    Yes, sir.

Q.    Who?

A.    I have more than one. The lead counsel is Richard Klugh.

Q.    And who is the other one?

A.    John Bergendahl, Lorenzo Polamares.

Q.    Are those lawyers available to you if you have any questions today that you wish to put to them?

A.    Yes. I have two lawyers standing outside right now.

and readily determined from sources whose accuracy cannot reasonably be questioned.'" (citing Fed. R. Evid. 201(b)(2)).

Q.      Which ones?

A.      I don't know the last name of Cynthia but she was sent over by Richard Klugh and Lorenzo Palomares.

Q.      And if at anytime you feel the need to consult with your lawyers, please let the grand jurors know and the grand jurors will afford you a reasonable opportunity to go and consult with your lawyers.

A.      I appreciate it.

FEC Mot. Summ. J., Ex. 2, ECF No. 142-5m at 2:14-3:10. Accordingly, Alliegro unequivocally stated, in a very detailed manner, that her testimony before the grand jury was pursuant to a subpoena and that she had counsel at the grand jury proceeding with whom she could have consulted if necessary. Notably, in her Bar Complaint, Alliegro did not assert that she was prevented from consulting with her counsel during her grand jury testimony. Nor did she contend that she was precluded from consulting with counsel before or after her grand jury testimony. And, importantly, Alliegro testified before the grand jury on December 18, 2014; however, Alliegro's Bar Complaint is dated June 15, 2017.[3] Thus, Alliegro submitted her Bar Complaint more than three years after she gave her grand jury testimony. And, Rivera has not presented any evidence indicating that Alliegro took any steps to withdraw or repudiate her grand jury testimony prior to the filing of the Declaration in this case. These factors all counsel against a finding that Alliegro's Bar Complaint is a more reliable form of evidence than Alliegro's sworn grand jury and plea colloquy testimony.

In conclusion, based upon the above analysis, the Court finds that the conclusory and ambiguous Alliegro Declaration, including the Bar Complaint incorporated therein, is insufficient to repudiate Alliegro's prior detailed grand jury and plea colloquy testimony. Furthermore, the Court finds that the Alliegro Declaration, and its incorporated Bar Complaint, are akin to a sham affidavit with the only exception being that they were made by a nonparty. *Cf. Madaio v. Fed. Bureau of Investigation*, CV-06-BE-00904-S-KOB, 2008 WL 11392887, at *5 (N.D. Ala. Mar. 31, 2008) (stating "[p]resumably, Madaio and his attorney

---

[3] Alliegro's Bar Complaint was notarized, by Jason Garcia (Notary Commission Number GG 102865), on June 16, 2017. ECF No. 147-5, Ex. E at p. 9. In a "curious" twist of fate, Jason Garcia notarized both Alliegro's Bar Complaint as well as her Declaration filed in this case (*see* ECF No. 147-7, Ex. G at p. 2).

are traveling under the assumption that Madaio may file an affidavit in the instant case to defeat summary judgment against him even if the affidavit testimony contradicts his plea and sworn testimony in the underlying criminal case. That assumption is mistaken[,] and this court will not countenance the filing of a sham affidavit.") (citing *Van T. Junkins v. U.S. Indus., Inc.*, 736 F.2d 656 (11th Cir. 1984); *Tippens v. Celotex Corp.*, 805 F.2d 949, 953-54 (11th Cir. 1986)). Much like the Court in *Madaio*, the Court here will not countenance the use of a "declaration" to undermine prior detailed sworn testimony voluntarily given in a long since resolved criminal prosecution.

### C. ALLIEGRO'S GRAND JURY AND PLEA COLLOQUY TESTIMONY ARE NOT PRECLUDED HEARSAY EVIDENCE AT SUMMARY JUDGMENT

Next, Rivera argues that Alliegro's grand jury and plea colloquy testimony are improper hearsay that should not be considered at summary judgment. In making this argument, Rivera insinuates without any evidence that Alliegro will not be available to testify at trial and, therefore, her grand jury and plea colloquy testimony would be inadmissible at trial. Rivera's insinuations are disconcerting given Alliegro's prior "departures" from the United States during the underlying criminal cases. It is not clear whether Rivera has knowledge or information concerning Alliegro's whereabouts that the Court lacks or whether Rivera's suggestions are mere puffery. Nonetheless, the Court finds that it can properly consider Alliegro's grand jury and plea colloquy testimony in ruling on FEC's Motion for Summary Judgment.

"[T]he appropriate question is not whether the [grand jury and plea colloquy testimony] would ever be admissible—they may not be. Instead, the question is whether the evidence contained within [that sworn testimony] could be presented in an admissible form at trial." *Fed. Trade Comm'n v. Lanier Law, LLC*, 715 F. App'x 970, 978-79 (11th Cir. 2017). *See also Morera v. Sears*, *Roebuck & Co.*, 141 F. Supp. 3d 1335, 1338 (S.D. Fla. 2015), *aff'd*, 652 F. App'x 799 (11th Cir. 2016) (holding that the district court could consider a sworn statement at summary judgment over the nonmoving party's hearsay objection because the sworn statement satisfied the requirements of Rule 56(c)") (citing *Ash v. Sambodromo, LLC*, 676 F.Supp.2d 1360, 1372 (S.D. Fla. 2009) (considering sworn statement on motion for summary judgment over non-movant's hearsay objection).

Pursuant to Rule 56(c)(4), "[a]n affidavit or declaration used to support or oppose a

motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Here, Rivera does not make any arguments suggesting that Alliegro's grand jury and plea colloquy testimony do not satisfy the requirements of Rule 56(c)(4). Regardless of Rivera's silence on this point, the Court finds that Rivera's testimony does in fact satisfy the requirements of 56(c)(4). There is no basis to conclude otherwise. As a consequence, the Court will consider Alliegro's grand jury testimony as well as her plea colloquy testimony in resolving FEC's Motion for Summary Judgment.

## II.   EVIDENCE ESTABLISHING RIVERA'S LIABILITY FOR VIOLATION OF 52 U.S.C. § 30122; 11 C.F.R. § 110.4(B)(1)(i)

### 1.   ALLIEGRO'S GRAND JURY AND PLEA COLLOQUY TESTIMONY

It is no surprise that Rivera sought to preclude the Court from considering Alliegro's grand jury and plea colloquy testimony in resolving FECs Motion as that testimony is very damning for Rivera. For the sake of brevity, the Court will outline the highlights of that testimony as follows:

- Alliegro and Rivera developed a plan that involved "Lamar Sternad who had already had a website going and everything and [Rivera] ordered [Alliegro] to go and try to finance [the Justin Lemar Sternad Campaign] to a certain point to divide the vote for Congressman Joe Garcia so that [Rivera] would have an easier opponent." FEC Mot. Summ. J., Ex. 2, ECF No. 142-5, 12:4-12.

- As part of this plan, Alliegro and Jenny Nillo met Rivera at the Catch of the Day Restaurant in Miami, Florida. *Id.* 12:13-18.

- After the meeting at the Catch of the Day Restaurant, Alliegro reached out to Sternad because she was directed to do so by Rivera. *Id.* 12:25-13:1-5.

- Alliegro and Jenny Nillo met with Sternad at Miller's Ale House in South Miami. *Id.* 13:15-14:1-5.

- During her meeting with Sternad and Jenny Nillo at Miller's Ale House, Alliegro offered to provide Sternad with "financial assistance, assistance with his mailers . . . strategic assistance, any kind of assistance, media assistance, [and] publicity [assistance]" for his campaign. *Id.* 14:6-11.

- Alliegro provided Sternad with a cellphone for his personal use and to use for his campaign. *Id.* 15:2-9.

- Sternad lacked the financial resources to pay the $10,440 qualifying fee for his campaign. *Id.* 16:9-10.

- Alliegro assisted Sternad with paying the $10,440 campaign qualifying fee by getting the money from Rivera and then depositing the money into Sternad's campaign bank account so that the fee could be paid from that account. *Id.* 16:5-17:20:7.

- The money to pay the $10,440 qualifying fee was deposited into Sternad's campaign bank account at two TD Bank branch locations in Washington, D.C. *Id.* 20:4-21:1; *see also id.* 23:21-24:3.

- Rivera informed Alliegro that he [Rivera] through his agent Bill Helmich would file Sternad's campaign qualifying documents in Tallahassee, Florida. 19:23-20:3.

- Rivera gave Alliegro the receipts for the two deposits made into Sternad's campaign bank accounts in Washington DC, and Alliegro then passed those receipts along to Sternad. *Id.* 20:24-21:4.

- The envelope that held Sternad's deposit receipts and his campaign qualifying paperwork (that had been filed with the Florida Department of State Division of Elections) also held the qualifying paperwork for Rivera's congressional campaign. *Id.* 21:5-12.

- Rivera gave Alliegro $1,060, in cash, to pass along to Sternad so that Sternad could rent a car to use for his campaign activities. *Id.* 21:20-22:20.

- At the behest of Rivera, Alliegro worked with Henry Barrios and Yolanda Rivas to create eleven flyers, in 72 hours, for the Sternad Campaign. 24:15-25:21.

- Once the flyers were completed, Rivera gave Alliegro cash to give to Yolanda Rivas to pay for her services in working on the eleven flyers for the Sternad Campaign; the amount Rivera provided to Alliegro for payment to Yollanda Rivas, however, was $100 below the amount due so Rivera gave Alliegro a $100 bill for Alliegro to give to Yolanda Rivas for payment in full. *Id.* 25:24-26:5.

- Rivera worked with Alliegro, Yolanda Rivas, and Sternad (who was on the telephone during the process) in designing the eleven flyers. *Id.* 26:6-11.

- In addition to the cash paid to Yolanda Rivas for the graphics work related to the flyers, Alliegro also paid Expert Printing for the actual printing of the flyers; Alliegro made that payment by delivering the payment in cash to Henry Barrios. Additionally, "there was $5,000 in cash delivered by Sunshine State Messenger Service" *Id.* 26:12-23.

- Rapid Mail and Computer Services mailed the flyers that Expert Printing printed according to the schedule that Rivera and Alliegro provided them with. *Id.* 26:24-27:16.

- Alliegro "believed" that Rapid Mail and Computer Services also mailed the flyers to the addresses listed in a zip drive that Hugh Cochran provided to Rivera. *Id.* 27:14-25.

- At the request of Rivera, Alliegro used Sunshine State Messenger Service "to pay off a bunch of people that I had to pay for Lamar Sternad's campaign because David, you know, asked me to do this for him." *Id.* 29:2-4.

- When Alliegro paid Rapid Mail she always paid in cash and she received that cash from Rivera. *Id.* 29:9-14.

- Alliegro received the cash to pay Expert Printing from Rivera. *Id.* 29:15-17.

- Alliegro paid in cash, funded by Rivera, for robocall services supporting the Sternad Campaign.

- Rivera and Alliegro strategically renamed the Sternad Campaign from the Justin Lamar Sternad Campaign to the Lamar Sternad Campaign to confuse African American voters. *Id.* 31:10-20.

- Alliegro and Rivera arranged the original script for the Sternad Campaign's robocalls. *Id.*

- The Sternad Campaign's robocalls were targeted and directed to the African American community. *Id.* 30:11-14.

- The Sternad Campaign's robocalls "were done through Urban Initiatives, Inc." by Willis Howard, but Rivera "mainly dealt with him. So [Alliegro] only had two or three conversations with" Willis Howard. *Id.* 30:17-31:8.

- Alliegro paid Willis Howard, in cash, and Rivera funded those cash payments. *Id.* 31:21-32:4.

- After speaking with Rivera, Alliegro advised Sternad to report the funds that were deposited into the Sternad Campaign's TD Bank account in Washington, D.C. to the FEC as a loan and then "go ahead and amend it later, because David supposedly had another plan of how he was going to take care of all this." *Id.* 32:18-33:1. However, those funds were not a loan. *Id.* 33:3-4.

- The funds that were used to pay for the rental car, the printing, and mailing were not reported initially on the FEC's Disclosure Form. *Id.* 33:5-13.

- Alliegro participated with Sternad in filing a false disclosure form with the FEC concerning the funds used to pay for the rental car as well as the printing and mailing services. *Id.* 34:4-8.

- Alliegro travelled to Nicaragua after her apartment was searched and a subpoena to appear before the grand jury was issued to her because "David [Rivera] thought, and I, that it would be a good idea that I go away for a while and let the scandal die down once again." *Id.* 34:9-20.

- On September 5, 2012, the day before Alliegro was supposed to report to the grand jury, Rivera and Alliegro "packed [Alliegro's] things that [Rivera] thought were necessary items for [Alliegro] to have and [that Alliegro] thought were necessary and [they] went and checked into a hotel and then [Rivera] went and got a ticket for [Alliegro] to travel to Nicaragua. In the morning [Rivera and Alliegro] went to go see a friend . . . and [afterwards Rivera] gave [Alliegro] the ticket . . . and [Alliegro] got on a plane and left to Nicaragua." *Id.* 35:4-12.

- In October of 2013, upon the advice of counsel, Alliegro returned to the United States whereupon she was interviewed by Assistant U.S. Attorney Thomas Mulvihill for two days and she left her passport with the FBI as a "token of good faith." *Id.* 36:19-25.

- After her interview with the Assistant U.S. Attorney, Rivera approached Alliegro and told her that he could get her to Mexico so Rivera and Alliegro drove to Orlando where they then flew to Houston and from Houston Rivera and Alliegro crossed the border into Mexico. *Id.* 36:2-18.

- Once in Mexico, Rivera gave Alliegro a passport and Alliegro flew to Nicaragua. *Id.* 36:25-37:1.

Notably, Alliegro's grand jury testimony mirrored the factual proffer put forward during Alliegro's plea colloquy (which Alliegro, at the time of her guilty plea, agreed was true and correct as to her conduct). *See* FEC Mot. Summ. J., Ex. 25, ECF No. 142-28.

Based upon Alliegro's grand jury and plea colloquy testimony it is quite obvious that Alliegro served as the "middleman" to assist Rivera in his efforts to illegally fund the Justin Lamar Sternad Congressional Campaign. Alliegro's testimony, however, is not the only source of evidence of her role in assisting Rivera's illegal campaign contributions. As discussed below, Alliegro's testimony is buttressed by the sworn testimony of no-less than six independent witnesses: Jenny Nillo, Henry Barrios, Yolanda Rivas, Hugh Cochran, John Borrero, and Justin Sternad.

### 2. TESTIMONIAL EVIDENCE FROM JUSTIN LAMAR STERNAD

During his deposition, Sternad testified that prior to April of 2012 the only donation that he received to his campaign was an in-kind donation of assistance building a campaign website from his co-worker at the Wyndham Gardens Hotel, Jesse Pupparo (who worked as a front desk clerk). FEC Mot. Summ. J., Ex. 5, ECF No. 142-8, Sternad Dep. 32:14-33:9. Sternad also testified during his deposition that Alliegro informed him that Rivera "took care of" Sternad's campaign qualifying filing fee. More specifically, that deposition testimony was as follows:

> Q.   Did Ana Alliegro ever tell you that David Rivera paid for your qualifying fee?
>
> A.   Yes.
>
> Q.   Okay. How did she say that?
>
> A.   She told me he took care of it.
>
> Q.   He took care of it?
>
> A.   Uh-huh.
>
> Q.   Do you know what that means; did she expound upon that?
>
> A.   Well, since money went into the account and was there for the check that was written to the state, I am going to take it that that meant that he deposited the money.

Q.      In your mind, that's what it means; correct?

A.      Correct.

*Id.* at 68:4-18. Sternad also testified, in his Declaration, that:

> Sometime after deposits were made into my 'Justin Sternad Congress' account with TD Bank to cover the $10,440 fee to qualify me in the primary election, Ms. Alliegro handed me an envelopethat [sic.] contained the deposit receipts and the paperwork that someone had filed with the Florida Department of State Division of Elections to qualify me in the election. Also in that envelope was aFederal [sic.] Express label and receipt with a notation for the qualification fee forCongressman [sic.] David Rivera's congressional campaign. At that point, I began to suspect that Mr. Rivera was involved with Ms. Alliegro and my campaign in some way.

FEC Mot. for Summ. J., Ex. 32, ECF No. 142-32, Sternad Dec. ¶ 5. Further, with respect to his campaign materials, Sternad testified that:

> From on or about July 2012 until August 2012, various vendors designed, created, and mailed flyers and other campaign materials for my campaign. Although I may have reviewed these flyers and provided some minor edits, I did not otherwise have anything to do with designing, creating or mailing these flyers, nor did I provide any funds to pay any vendor for work associated with these flyers.

*Id.* ¶ 7.

Overall, Sternad admitted, as part of the factual proffer supporting his guilty plea, that he accepted over $70,000 in illegal campaign contributions. *United States v. Justin Lamar Sternad*, No. 1:13-cr-20108 (S.D. Fla. Mar. 15, 2013), ECF No. 13 at 8.[4] To be clear, the

---

[4] The factual proffer supporting Sternad's guilty plea was not filed in this case; however, the transcript of Sternad's sentencing was filed with the Court as an exhibit to the FEC's Motion for Summary Judgment. Moreover, the factual proffer in question was referred to in Sternad's deposition. FEC Mot. Summ. J., Ex. 5, ECF No. 142-8, Sternad Dep. 66:25-67:4. As such, the Court finds that the factual proffer supporting Sternad's guilty plea is part and parcel of the record presently before this Court. Furthermore, the document entitled *Factual Basis of the Plea of Guilty*, in which the factual proffer supporting Sternad's guilty plea is asserted, is an authentic record filed with this Court in *United States v. Sternad*, Case No. 13-cr-20108-CMA (at ECF No. 13); therefore, the  Court takes judicial notice of the factual proffer supporting Sternad's guilty plea. *See Phillips v. City of W. Palm Beach*, 18-CV-80172, 2018 WL 3586179, at *5 (S.D. Fla. July 26, 2018) ("Because the Factual  Proffer is both authentic and relevant to Plaintiff's claim, the Court will also take judicial notice of the document.").

factual proffer supporting Sternad's guilty plea stated the following:

- On or about May 25,2012, a co-conspirator hand-delivered $500, in cash, to JUSTIN LAMAR STERNAD, of which $300 was subsequently deposited into the account of "Justin Sternad for Congress", account number xxx-xxxI570.

- On or about July 10, 2012, defendant JUSTIN LAMAR STERNAD signed and mailed a FEC Form 3 to the Federal Election Commission on behalf of the 'Justin Sternad for Congress' committee but failed to report the aforementioned cash contribution which was received on or about May 25, 2012. Instead, defendant JUSTIN LAMAR STERNAD falsely claimed the aforementioned cash contribution was a loan from his personal funds to the "Justin Sternad for Congress" committee.

- On or about June 7, 2012, a deposit of $5,000, in cash, was made into the account of "Justin Sternad for Congress", account number xxx-xxxI570, at a TD Bank branch. On or about June 8, 2012, a deposit of $5,500, in cash, was made into the account of "Justin Sternad for Congress", account number xxx-xxxI570, at another TD Bank branch.

- On or about June 8, 2012, check number 301, payable to the Department of State, in the amount of $10,440, drawn on the account of "Justin Sternad for Congress", account number xxxxxx1570 at TD Bank was provided to the Florida Department of State Division of Elections with the notation "Qualifying Fee 2012."

- On or about July 10, 2012, defendant JUSTIN LAMAR STERNAD signed and mailed a FEC Form 3 to the Federal Election Commission on behalf of the "Justin Sternad for Congress" committee but failed to report a contribution of $5,000, in cash, which was received on June 7, 2012 and a contribution of $5,500, in cash, which was received on June 8, 2012 by the "Justin Sternad for Congress" committee, TD Bank account number xxx-xxxI570. Instead, defendant JUSTIN LAMAR STERNAD falsely claimed the aforementioned cash contributions were loans from his personal funds to the "Justin Sternad for Congress" committee.

- On or about July 10, 2012, defendant JUSTIN LAMAR STERNAD signed another FEC Form 2 Statement of Candidacy which amended his previously filed FEC Form 2 and designated the 'Lamar Sternad for Congress' committee as his principal campaign committee for the Democratic Party primary election for Florida's 26th Congressional District.

- On or about July 2, 2012, a co-conspirator deposited $1,060, in cash, into the account of Justin Sternad, account number xxxxxx4360, at Wells Fargo Bank, N.A.

- On or about July 2, 2012, defendant JUSTIN LAMAR STERNAD rented a motor vehicle from Enterprise Rent-A-Car to be used in his campaign for the Democratic Party primary election for Florida's 26th Congressional District.

- On or about July 14, 2012, co-conspirators met with a graphic designer to develop flyers for the political campaign of defendant JUSTIN LAMAR STERNAD. On or about July 15, 2012, co-conspirators met, again, with the graphic designer to develop flyers for the political campaign of defendant JUSTIN LAMAR STERNAD.

- While working together during the weekend of July 14-15, 2012, a co-conspirator hand-delivered $2,600, in cash, to the graphic designer for the designer's work in developing the flyers.

- On or about July 23, 2012, a co-conspirator hand-delivered $10,000, in cash, to Inkpressions, Inc. d/b/a Expert Printing & Graphics, the printer of the aforementioned flyers.

- From on or about July 17, 2012 through on or about July 24, 2012, approximately $15,901.35, in cash, was delivered to Rapid Mail & Computer Services, Inc. for mailing the aforementioned flyers.

- On or about July 31, 2012, defendant JUSTIN LAMAR STERNAD signed and mailed a FEC Form 3 on behalf of the "Lamar Sternad for Congress" committee to the Federal Election Commission but failed to report the aforementioned contributions which were received between July 1, 2012 and July 25, 2012.

- On or about August 2, 2012, a co-conspirator provided $5,000, in cash, to Inkpressions, Inc. d/b/a Expert Printing & Graphics.

- From on or about August 2, 2012 through on or about August 8, 2012, approximately $22,100, in cash, was delivered to Rapid Mail & Computer Services, Inc. for their services in mailing the aforementioned flyers.

- On or about August 9, 2012, a co-conspirator hand-delivered check number 8939, in the amount of $13,824.85, payable to Expert Printing, drawn on account xxxxxx-9803 at Bank United, to Inkpressions, Inc. d/b/a Expert Printing & Graphics.

- On or about August 9, 2012, at the request of a co-conspirator, Inkpressions, Inc. d/b/a Expert Printing & Graphics issued check number 9998, in the amount of $9,000, payable to Rapid Mail, which was subsequently delivered to Rapid Mail & Computer Services, Inc.

- On or about August 17, 2012, defendant JUSTIN LAMAR STERNAD signed

and mailed FEC Form 3 on behalf of the "Lamar Sternad for Congress" committee to the Federal Election Commission but failed to report the aforementioned contributions which were received between July 26, 2012 - August 17, 2012. Instead, defendant JUSTIN LAMAR STERNAD falsely claimed the aforementioned contributions were loans from his personal funds to the "Lamar Sternad for Congress" committee.

- On or about August 17, 2012, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant, JUSTIN LAMAR STERNAD, in a matter within the jurisdiction of the executive branch of the United States, knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation in that the defendant represented on a FEC Form 3 filed on behalf of the "Lamar Sternad for Congress" committee with the Federal Election Commission that he had made loans in the amount of $63,801.70 from his personal funds to the "Lamar Sternad for Congress" committee when as the defendant well knew and believed that he had loaned less than $300.00 from his personal funds to the "Lamar Sternad for Congress" committee.

- During calendar year 2012, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant, JUSTIN LAMAR STERNAD, while a candidate for federal office, knowingly and willfully accepted contributions in excess of the limits of the Federal Election Campaign Act, which aggregated at least $25,000. In fact, the value of the illegal transactions exceeded $70,000.

*Id.* at 3-8. Thus, Sternad's factual proffer supporting his guilty plea both corroborates and fills in the blanks in Alliegro's grand jury and plea colloquy testimony.

### 3. DECLARATION OF JENNY NILLO

In her Declaration, Jenny Nillo ("Ms. Nillo") testified that she met with Alliegro and Rivera at Catch of the Day restaurant in Miami, Florida in early April of 2012. FEC Mot. Summ. J., Ex. 3, ECF No. 142-6, Nillo Dec. ¶ 4. Notably, this meeting is also documented by Rivera's American Express Statement which reflects a charge on April 2, 2012 for food/beverage at Catch of the Day restaurant. FEC Mot. Summ. J., Ex. 4, ECF No. 142-7, AMEX 00009. Ms. Nillo further testified that she saw Rivera and Alliegro looking at a candidate's campaign materials and that, while she did not know which candidate the materials belonged to, the name "Sternad" and the phrase "Democratic candidate" came up during the discussion between Rivera and Alliegro. FEC Mot. Summ. J., Ex. 3, ECF No. 142-6, Nillo Dec. ¶ 4. Additionally, Ms. Nillo testified that a week after her meeting with Alliegro and Rivera at Catch of the Day, she met with Alliegro and Sternad at Miller's Ale

House in Miami, Florida. *Id.*, ¶ 7. During that meeting, Ms. Nillo and Alliegro had a discussion with Sternad concerning how Ms. Nillo and Alliegro would be assisting the Sternad Campaign. *Id.* According to Ms. Nillo, when Sternad expressed concern about how his campaign would be funded, Alliegro "said not to worry, and that someone else would be taking care of that." *Id.* Ms. Nillo also recalled Alliegro saying that "she needed to show Mr. Rivera things that she was working on for the Sternad Campaign". *Id.*, ¶ 9.

### 4.  DECLARATION OF HENRY BARRIOS

In his Declaration, Henry Barrios, ("Mr. Barrios"), testified that in 2012 he was the owner of Inkpressions, Inc., d/b/a Expert Printing and Graphics (also known as Expert Printing and Marketing Solutions ("Expert Printing")). FEC Mot. Summ. J., Ex. 10, ECF No. 142-13, Barrios Dec. ¶ 2. He further testified that, in July 2012, Alliegro contacted his business to price out campaign mailers, and that he provided costs estimates and prepared invoices to Alliegro's business - "On Target Hispanic Marketing, Inc." *Id.*, ¶ 4. According to Mr. Barrios, the initial design work on this project was completed by Yolanda Rivas, Expert Printing's Graphic Designer, who worked the weekend after the project began and was paid directly for her services. *Id.*, ¶ 5. Mr. Barrios also testified that "[t]hat weekend, on a Saturday, David Rivera and Ana Alliegro both came to the print shop to review and edit the mailers as they were produced by Ms. Rivas. Mr. Rivera was there for pretty much the whole day and was actively engaged reviewing and making edits and changes to the mailers." *Id.*

Furthermore, "[a]fter Mr. Rivera arrived in town, [Mr. Barrios] was told not to invoice On Target Hispanic Marketing, but instead the Lamar Sternad Campaign." *Id.*, ¶ 6. Then, when Mr. Barrios inquired as to when he would be paid, Alliegro told him that he would be paid "when the 'big [guy or man] comes from Washington.'" *Id.* Mr. Barrios testified that he "understood that to be a reference to Rivera. Because my payment was contingent upon David Rivera getting into town and because of his involvement in the content of the mailers, I understood this was Mr. Rivera's project." *Id.* Expert Printing was paid in full for all the campaign mailers described above. *Id.*, ¶ 7. Mr. Barrios further testified that "the invoices for a first round of mailers were dated July 19, 2012, and totaled $20,430.21 . . . [and] [a]t David Rivera's request, [Mr. Barrios] forwarded the mailer invoices to him by email on July 23, 2012. The attachments to that email show invoices labeled by invoice numbers: '72616.pdf; 72578.pdf; 72586.pdf; 72595.pdf; 72596.pdf; 72597.pdf; 72615.pdf.'" *Id.*

The Court notes that Exhibit 1 (page IEPG 00001) to Mr. Barrios' Declaration is a hard copy of an email, dated July 23, 2012 (8:09 am), from henry@expertprinting.com to rivera2004@comcast.net. Barrios Dec., Ex. 1, IEPG 00001. The body of the email states, "Hello David. Attached is [sic.] the invoices." *Id.* And the email is signed "Henry Barrios". *Id.* Below that signature is what appears to have been the physical address, phone number, website address, and logo for Expert Printing and Marketing Solutions. *Id.* Additionally, the email reflects that there were six pdf documents attached to the email which were labeled: 72616.pdf; 72578.pdf; 72586.pdf; 72595.pdf; 72596.pdf; 72597.pdf; and 72615.pdf. *Id.*

In his Declaration, Mr. Barrios also testified that an invoice for a part of a second round of mailers, dated August 9, 2012, was for $15,000.00. *Id.*, ¶ 9. The Invoice for this round of mailers reflects that it was delivered to: Lemar Sternad for Congress, 1945 SW 21 Terrace Miami FL 33145, Ana Alliegro. Barrios Dec., Ex. 2, IEPG 00058.

Finally, in his Declaration, Mr. Barrios testified that "there was an additional, final portion of the second round of mailers for which we were asked to invoice a different entity, Florida Action Network. I did so, invoicing that entity on August 9, 2012 for $13,824.85. We received payment for that work through a check from what was identified as a Florida Action Network account." *Id.*, ¶ 10. That invoice was reflected through Exhibit 2 (page IEPG 00059) to Mr. Barrios' Declaration.

### 5. DECLARATION OF YOLANDA RIVAS

For approximately 12 years, until 2017, Yolanda Rivas served as a graphic designer for Expert Printing in Miami, Florida, where she designed campaign materials for candidates running for public office. FEC Mot. Summ. J. Ex. 27, ECF No. 142-30, Rivas Dec., ¶ 3. In her Declaration, Ms. Rivas testified that "[s]ometime in July 2012, Mr. Barrios asked me if I could work over the weekend with Ana Alliegro in designing some campaign materials on a rush job for Expert Printing. I knew Ms. Alliegro through my work at Expert Printing. At the time I was asked to do the job, I did not know that this was for the campaign of Justin Lamar Sternad." *Id.* ¶ 5. Importantly, Ms. Rivas further testified that both Alliegro and Rivera were present and directed her in completing the project on a weekend in July in 2012. More specifically, Ms. Rivas stated:

The next day, Saturday, Ms. Alliegro arrived at the Expert Printing office, as did Congressman David Rivera. Henry Barrios, the owner of Expert Printing, was there as well. I remember this vividly because Mr. Rivera brought food

from McDonald's for everyone. I knew Mr. Rivera because I had previously designed campaign materials for him. I was surprised to see Mr. Rivera, and had no idea that he was there to work with Ms. Alliegro on the Sternad Campaign flyers too. However, as we began working it became clear to me that Mr. Rivera was there to work with Ms. Alliegro and me on the Sternad Campaign flyers. Mr. Rivera was at the Expert Printing office off and on throughout the day and evening on Saturday and Sunday. Mr. Rivera, Ms. Alliegro and I worked that entire weekend together on the Sternad flyers, and Mr. Rivera provided corrections and additions to the flyers that we designed. I did not see or speak to Sternad at all during the time Mr. Rivera, Ms. Alliegro and I were working on the Sternad flyers.

*Id.* ¶¶ 7-8. Ms. Rivas also testified that Alliegro paid her directly for working on the project. Specifically, with respect to her payment, Ms. Rivas testified that "[o]n Sunday evening, Ms. Alliegro left the Expert Printing office and returned with an envelope of cash as payment for my work . . . Although I do not recall the exact amount of cash in the envelope, I do recall counting the money and noticing that it did not include all of our agreed payment. Ms. Alliegro left again and later returned with the additional payment in cash." *Id.* ¶ 10. Additionally, Ms. Rivas testified that "[l]ater that month, Ms. Alliegro returned to Expert Printing again, as did David Rivera. I emailed a copy of one of the Sternad flyers to Mr. Rivera and Ms. Alliegro." *Id.* ¶ 12.

Exhibit 2 to Ms. Rivas's Declaration is a copy of an email, dated July 31, 2012, from Yoli@expertprinting.com to anaalliegro@gmail.com and, notably, rivera2004@comcast.net is cc'ed. The body of the email states, "[h]ere we go! Thank you and have a great day." The email is signed "Yolanda Rivas[,] Pre-Press Department[,] Expert Printing & Graphics[,] a Division of Inkpressions, Inc." FEC Mot. Summ. J., Exhibit 28, EFC No. 31 at FEC01099. Finally, it should be noted that Ms. Rivas testified that the first time that she met Sternad was a week *after* she completed the work on the flyers. FEC Mot. Summ. J. Ex. 27, ECF No. 142-30, Rivas Dec., ¶ 11.

### 6. DECLARATION OF HUGH COCHRAN

In his Declaration, Hugh Cochran ("Mr. Cochran") testified that he has been the owner and president of Campaign Data, Inc. since 1997. FEC Mot. for Summ. J. Ex. 11, ECF No. 142-14, Cochran Dec., ¶ 2. Mr. Cochran further testified that in the summer of 2012, Rivera asked him to obtain mail files and directed him to send the mail files to John Borrero

of Rapid Mail and Computer Services. *Id.*, ¶ 4. Mr. Cochran also testified that he assumed that he was gathering demographic data for Rivera's campaign but after he emailed the files to John Borrero, John Borrero told him that the demographic data was actually for the Sternad campaign. *Id.* The emails that Mr. Cochran sent to John Borrero regarding the mail files show that Cochran referred to Rivera in the body and/or subject lines of the emails and the emails reflect that the files were for Rivera. *See*, Mot. Summ. J., Ex. 23, ECF No. 142-26, CADA-02267 through CADA-02270. For instance, in the July 16, 2012 email from Cochran (hugh@floridacampaigndata.com) to John Borrero (john@rapidmail.us), the subject of the email is "Mail files for David Rivera" and the body of the email states, "John, Here are three mail files for Rivera. Two go to Dade County and one goes to Monroe County." FEC Mot. Summ. J., Ex. 23, ECF No. 142-26, CADA-02267.

### 7. DECLARATION OF JOHN BORRERO

John Borrero ("Mr. Borrero") testified in his Declaration that he is the owner of Rapid Mail & Computer Services ("RMCS") and, as such, he provides bulk and direct mailing services. FEC Mot. Summ. J., Ex. 12, ECF No. 142-15, Borrero Dec., ¶ 2. Mr. Borrero further testified that in the summer of 2012 Rivera hired him to provide mailing services in connection with the August 14, 2012 congressional primary election. *Id.*, ¶ 4. At that the time that Rivera hired Mr. Borrero, Mr. Borrero thought that he was being hired to perform work in connection with Rivera's campaign. *Id.* Mr. Borrero also testified that one month prior to the primary election, Rivera called him early one morning to obtain a cost estimate for mailers and during that conversation Rivera wanted to know if he could pay Mr. Borrero in cash. *Id.*, ¶ 5.

Additionally, Mr. Borrero testified that three or four days before the first mailing, his company received the flyers but upon receipt he noticed that the flyers were for the "Sternad congressional campaign" so he called Rivera and informed of him of that fact. *Id.* ¶ 6. In response, Rivera confirmed that those were in fact the flyers that he wanted Mr. Borrero's company to mail out using the addresses in the mail files supplied by Mr. Cochran. *Id.* Mr. Borrero also testified that Rivera later came into his office and provided the specific dates for when the Sternad flyers were to be mailed and reiterated that he would pay the invoices in cash. *Id.*, ¶ 7. Mr. Borrero's company sent out about twelve mailers for the Sternad campaign. *Id.*, ¶ 9. During the course of this work, it became clear to Mr. Borrero that this was Rivera's

project and Alliegro was assisting him with it. *Id.*, ¶ 8. In fact, when there was an issue with payment, Mr. Borrero talked about it with Rivera. *Id.* Likewise, when there were discrepancies between the directions he received from Rivera and Alliegro, Mr. Borrero contacted Rivera who informed Mr. Borrero that he should follow Rivera's directions not Alliegro's directions. *Id.*

Mr. Borrero received most of the payments for the mailers in cash, and Alliegro "generally delivered Mr. Rivera's cash payments in envelopes the day before each mailing was to be dropped, but Mr. Rivera may have delivered at least one of the envelopes containing a cash payment himself." *Id.*, ¶ 9. Moreover, Mr. Borrero testified that:

> On one of the days that a particular mailer was to be dropped, it was an especially rainy day. I did not receive a pre-payment in cash from either Ms. Alliegro or Mr. Rivera. I called Rivera to ask about the payment. I explained to Rivera that it was 12:30-1:00 p.m. and the Post Office would not take the mailers without being paid, and I could not front him the three or four thousand dollars that it would cost to mail the flyers. Mr. Rivera asked me if I had checked my company mailbox outside the office. I sent my assistant Vivian to the mailbox outside, and she returned with an envelope containing cash. Given the timing and the way Rivera directed me to check the company mailbox, Rivera had either delivered this money himself or overseen its delivery very closely.

*Id.*, ¶¶ 10-11.

Mr. Borrero sent out two rounds of mailers. *Id.*, ¶ 12. The first six mailers were sent in mid-July 2012, and the second round of six mailers began at the very end of July 2012 -- in the days leading up to the August 14, 2012 primary election. *Id.* With respect to the specifics of the mailers, Mr. Borrero's Declaration states as follows:

> **Mailer #1, Lamar for Congress.** An RMCS invoice dated July 17, 2019 for the "Lamar for Congress July 12" mailing is attached at Exhibit 1, RMCS-00001. This invoice initially was for $2,624.35. My hand-written notation added a $100 rush charge, which with tax brought the total to $2,731.35. This is the amount that Mr. Rivera paid for this mailer. Another of my handwritten notations on the face of the invoice confirms this invoice was paid in cash. A copy of the mailer is attached at Exhibit 1, RMCS-00057-58.
>
> **Mailer #2 Obamacare/Trayvon.** An RMCS invoice for the "Mailer #2 Obamacare/Trayvon" mailer is attached at Exhibit 2, RMCS-00003. This invoice was for $2,624.35. This is the amount that Mr. Rivera paid for this mailer. My handwritten notation on the face of the invoice confirms this invoice was paid in cash. This invoice is undated but occurred between July 17 and 24, the dates of the invoices for the first and third mailers. A copy of the

mailer is attached at Exhibit 2, RMCS-00052-53.

**Mailer #3 Believes in America Too.** An RMCS invoice dated July 24, 2012 for "Believes in America Too Mailer #3" is attached at Exhibit 3, RMCS-00005. This invoice was for $2,624.35. This is the amount that Mr. Rivera paid for this mailer. My handwritten notations on the face of the invoice confirms this invoice was paid in cash. A copy of the mailer is attached at Exhibit 3, RMCS-00061-62.

**Mailer #4 Lamar for Congress.** An RMCS invoice dated July 24, 2012 for "Lamar for Congress Mlg #4" is attached at Exhibit 4, RMCS-00007. This invoice was for $2,624.35. This is the amount that Mr. Rivera paid for this mailer. My handwritten notation on the face of the invoice confirms this invoice was paid in cash. A copy of the mailer is attached at Exhibit 4, RMCS-00069-70.

**Mailer #5 Lamar for Congress.** An RMCS invoice dated July 24, 2012 for "Lamar for Congress Mlg #5" is attached at Exhibit 5, RMCS-00009. This invoice was for $2,624.35. This is the amount that Mr. Rivera paid for this mailer. My handwritten notations on the face of the invoice confirms this invoice was paid in cash on July 24, 2012. A copy of the mailer is attached at Exhibit 5 RMCS-00063-64.

**Mailer #6 Lamar for Congress.** An RMCS invoice dated July 24, 2012 for "Lamar for Congress Mlg #6" is attached at Exhibit 6, RMCS-000011. This invoice was for $2,624.35. This is the amount that Mr. Rivera paid for this mailer. My handwritten notations on the face of the invoice confirms this invoice was paid in cash. A copy of the mailer is attached at Exhibit 6 RMC -00065-66. My handwritten notation on the Job Master report, attached as part of Exh. 12 at RMC -00010, shows RMCS provided this invoice to Rivera.

**Second Round Mailing, Six Mailers.** Attached as Exhibit 7 are RMCS invoices for six mailers, identified as "Lamar Second Round Mlg" or "Lamar Second Round 6-Mlgs," The first invoice is dated July 30, 2012, and updates and revisions are provided in invoices dated August 6, 7, 18, and 28, 2012. The second round included the mailer attached at Exhibit 7, USPS-000043-44. The total invoiced, as reflected in the August 28, 2012 invoice at RMCS- 00016, was $31,044. Mr. Rivera paid in cash for $22,044 of these services. Several handwritten notations on the invoices reflect payment in cash.

$9000 of the payments for the second round of six mailers was paid through a check from Expert Printing. My handwritten notation on the face of the August 28, 2012 invoice in Exhibit 7 at RMCS-00016 reflects that payment by check and that the remaining balance was paid in cash. My company mailed these pieces at the Miami General Mail Facility ("MIA") and at the South Florida Station in Pembroke Pines, Florida ("South Florida"). As part of the work on

the Sternad mailers for Mr. Rivera, I received emails from Hugh Cochran of Campaign Data, Inc. with mail address zip files attached (copies attached as Exhibit 11 with attachments omitted). These files of mail addresses were for the targeted mailing of the Sternad flyers.  The text of the emails subject lines, and attachment file names all stated that these were the "Mail Files for David Rivera." Many of the emails sent to me with the mail files attached also copied Rivera. At Rivera's request, I sent directly to Rivera by email price quotes for the work he proposed that RMCS complete on the Sternad mailings. A copy of one of those emails is attached at Exhibit 11, RMCS-00051.

The RMCS business records attached at Exhibits 1-11 are true and accurate copies maintained by RMCS in the regular course of its business activities and the USPS records reflect those transactions. I have also reviewed the documents with RMCS bates numbers 00001-000171, produced to the Federal Election Commission by the United States Attorney's Office, they are true and accurate copies of RMCS business records maintained in the ordinary course of its business that RMCS had previously submitted to the United States Attorney's Office.

*Id.*, ¶¶ 13-21, 25-26. And, sure enough, the invoices, business records, and other documents referenced in the above were attached to Mr. Borrero's Declaration. Moreover, those invoices, records, and documents confirmed Mr. Borrero's above testimony. It should also be noted that Mr. Borrero's deposition testimony was consistent with his Declaration. *See, e.g.*, FEC Mot. for Summ. J., Ex. 29, ECF No. 142-32, Borrero Dep. 168:3-170:6; 182:11-183:23.

### 8. OTHER DOCUMENTARY EVIDENCE ESTABLISHING RIVERA'S LIABILITY

In addition to the above (as well as the documents and exhibits attached to and/or referred in the declarations and depositions discussed above), the FEC proffered a plethora of other documentary exhibits to further outline the scheme that Rivera and Alliegro orchestrated. The Court will only highlight the following:

a. The transcript of a conversation between Rivera and Alliegro, on June 5, 2012, that was recorded on Alliegro's cellphone. During that conversation Rivera and Alliegro discussed the strategic timing of when Rivera (through Bill Helmich) should submit the qualifying paperwork in Tallahassee, Florida for a particular, but not specified, candidate. FEC Mot. Summ. J., Ex. 26, ECF No. 142-29.

b. An FBI Phone Examination Report, FEC Mot. Summ. J., Ex. 30, ECF No. 142-33 (AZPT 00001 through AZPT 00059). This Report contains text messages exchanged amongst and between Alliegro's cellphone, Rivera's cellphone, and Sternad's cellphone.[5] In sum, amongst other matters, the

---

[5] In his Responses to the FEC's Interrogatories, Rivera confirmed that his cellphone number

substance of these text messages relate to the Sternad Campaign, the FEC filings for the Sternad Campaign, the Miami Herald's investigation of and articles concerning the Sternad Campaign, Sternad's post-campaign

is: (786) 258-2222. FEC Mot. Summ. J., Ex. 31, ECF No. 142-34 at 3. Similarly, in his Declaration, Sternad confirmed that, from on or about April 2012 through August 2012, he used a cellphone that Alliegro provided to him and the phone number for that cellphone was: (786) 548-5008. FEC Mot. Summ. J., Ex. 32, ECF No. 142-35 at ¶ 8. Additionally, in his Declaration, Sternad confirmed that, during the relevant period for this action, Alliegro used two cellphones with the phone numbers: (305) 506-7396 and (850) 590-2939. *Id.* Finally, Sternad also confirmed that the FBI Examination Report (FEC Mot. Summ. J., Ex. 30, ECF No. 142-30 (bates numbered as AZTP 00001 through AZTP 00059)) "contains printouts of text messages and logs of calls that to the best of [his] recollection, [he] sent to and received from Ms. Alliegro using the number (786) 548-5008." FEC Mot. Summ. J., Ex. 32, ECF No. 142-35 at ¶ 9. Pursuant to the Agreed Order Granting Government's Sealed Motion Seeking Modification of Order Granting Federal Election Commission's Petition for Disclosure of Grand Jury Materials, entered in this case at ECF No. 92, the United States Attorney's Office was authorized to disclose to the FEC and Rivera, amongst other materials, the "documents, discs, and recordings identified in ECF No. 17, Case No. 14-CR-20102-RNS." ECF No. 92 at 3.

Continuing down the rabbit hole, in relevant part, ECF No. 17 at 4 in Case Number 14-cr-20102-RNS, states:

> During the search of defendant Ana Alliegro's apartment, the Government seized computers, cellphones, electronic devices, and electronic media. . . Among the aforementioned identified items which were seized pursuant to said warrant, the following items are provided in defendant's copy of this response to the standing discovery order and are more specifically identified as . . . AZTP 00001 to AZTP 00103.

*United States v. Alliegro*, Case no. 14-CR-20102-RNS, ECF No. 17 at 4. Thus, the text messages contained in Exhibit 30 to the FEC's Motion (ECF No. 142-30 (bates labeled as AZTP 00001 through AZTP 00103)) were seized as part of a search of Alliegro's apartment that was conducted pursuant to a lawful search warrant. Moreover, the docket in Alliegro's criminal case does not reflect that the cellphones and text messages seized from her apartment were found to be unlawfully seized. Nor does that docket reflect that the Court made a finding that the cellphones seized from Alliegro's apartment did not belong to her. Indeed, Alliegro's cellphone and the search of her cellphone were even referenced during the factual proffer supporting Alliegro's plea colloquy. FEC Mot. Summ. J., Ex. 25, ECF No. 142-28 at 20. And, assuming that he would have the standing to do so and such a claim could even be asserted at this late juncture (which is debatable at best), Rivera has not challenged the lawful seizure of Alliegro's cellphones nor has he argued or even suggested that the cellphones at issue were not Alliegro's cellphones. Rivera's opposition brief is entirely silent on this point. The Court, therefore, finds that the text messages identified in Exhibit 30 to FEC's Motion were found on and were sent from and/or to Alliegro's cellphones.

employment issues/concerns, the Joe Garcia campaign, Sternad campaign advertising, Sternad campaign strategy, the Rivera Campaign, and potential criminal liability. FEC Mot. Summ. J., Ex. 30, ECF No. 142-33 (bates numbered as AZTP 00001 through AZTP 00059).

c.  An FBI Extraction Report, FEC Mot. Summ. J., Ex. 35, ECF No. 142-38, which contains call logs and text messages to and from Alliegro's cellphone.[6] The call logs and text messages reflect ongoing communications from and between Alliegro, Rivera, and Sternad related to strategy in the 2012 Democratic Primary and how to handle the post-election investigations. Notably, Alliegro served as the "middleman" in these communications.

d.  A FedEx Shipment Information Report reflecting a shipment from Rivera to Bill Helmich, shipped on June 2, 2012. FEC Mot. Summ. J., Ex. 40, ECF No. 142-40.

e.  Sternad's FEC Reports (including explanatory cover letters and amended filings). These reports served as numbered exhibits to Sternad's Deposition and were submitted as numbered exhibits (7, 8, 9, 39, 40, and 41) to FEC's Motion for Summary Judgment (ECF Nos. 142-10, 142-11, 142-12, 142-42, 142-43, and 142-44). In short, Sternad's FEC filings demonstrate that he failed to report cash contributions and falsely reported that cash contributions were loans to his campaign committee from his personal funds. *See* ECF No. 142-10, 142-11, 142-12, and 142-42. Presumably in an effort to rectify his previous false FEC reports/filings, on January 16, 2014, Sternad filed his amended FEC reporting forms and explanatory cover letters through which he advised of the roles that "Alliegro and/or Rivera" played in providing financial contributions to his campaign. *See* ECF Nos. 142-43 and 142-44.

The above documentary exhibits further clarify and crystallize Rivera's liability in this matter as they corroborate the testimonial evidence submitted in support of the FEC's Motion. This is especially true given that, as previously discussed, Rivera's opposition to the FEC's Motion is limited to evidentiary arguments concerning Alliegro's grand jury and plea colloquy testimony.

### III.   RIVERA'S EVIDENCE FAILS TO CONTROVERT THE FEC'S EVIDENCE

As discussed throughout this Order, Rivera's opposition relies upon his unfounded contentions that the Court purportedly cannot consider Alliegro's grand jury and plea colloquy testimony as part of its resolution of FEC's Motion. To further support his opposition, Rivera relies upon the following exhibits to his statement of undisputed facts in

---

[6] *See supra* note 5.

opposition to FEC's Motion: 1) Exhibit A, excerpts from the deposition of Sternad; 2) Exhibit B, excerpts from the deposition of John Borrero; 3) Exhibit C, an affidavit from Rivera; 4) Exhibit D, another affidavit from Rivera; 5) Exhibit E, Alliegro's Bar Complaint against Assistant U.S. Attorney Thomas Mulvihill; and 6) Exhibit F, a complaint Alliegro purportedly filed with the U.S. Department of Justice's Office of Professional Responsibility. The Court has reviewed these exhibits and finds them wanting. Specifically, these exhibits fail to demonstrate a genuine issue of fact that would preclude the Court from entering summary judgment in favor of the FEC.

First, when the excerpts of the depositions that Rivera proffered are reviewed as a whole with the entirety of those depositions (as opposed to just spliced and cherry-picked pages), it becomes quite evident that Sternad and Borrero did not testify in the manner that Rivera suggests. This becomes even more evident when the Sternad and Borrero declarations are reviewed.

Second, Rivera's affidavits fail to create an issue of fact in light of the previously described abundant evidence in support of the FEC's Motion. "[T]here must exist a conflict in substantial evidence to pose a jury question." *Hall v. Sunjoy Indus. Group, Inc.*, 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citation omitted). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Here, the record evidence in this case blatantly and overwhelmingly contradicts Rivera's story.

And, finally, the Court finds that Alliegro's complaints against Mr. Mulvihill do not create an issue of fact. In doing so, the Court adopts and incorporates its discussion in Section I.A herein.

It, moreover, must be noted that Rivera's opposition brief did not contest the testimony of Sternad, Jenny Nillo, Henry Barrios, Yolanda Rivas, Hugh Cochran, or John Borrero. Nor did the opposition brief contest or even address the testimony of Alliegro other than in its misguided efforts to have that testimony precluded from consideration. Accordingly, the testimonial evidence in this case establishes that Rivera orchestrated a scheme in which he made unlawful contributions in the name of another to the Sternad campaign for the purpose of undermining Joe Garcia's campaign. Rivera accomplished this by using Alliegro and other

third parties to make cash payments on behalf of the Sternad campaign. Additionally, the uncontested testimonial evidence adduced in this case shows that Rivera directed Sternad to file false reports with the FEC. Therefore, the Court holds that the FEC is entitled to summary judgment in this matter.

## IV.   RIVERA'S CIVIL PENALTY

The Court having determined that the FEC is entitled to summary judgment must now fashion a civil penalty against Rivera for his violation of 52 U.S.C. § 30122. The FEC contends that the Court should enter a civil penalty of $456,000 against Rivera because he "knowingly and willfully made $75,927.31 in contributions in the name of another." FEC Mot. Summ. J., ECF No. 142 at 16.   Oddly, Rivera's opposition brief is silent on this issue.[7]

In relevant part, the 2012 version of 11 C.F.R. § 111.24 provides:

(a) Except as provided in 11 CFR part 111, subpart B and in paragraph (b) of this section, a civil penalty negotiated by the Commission or imposed by a court for a violation of the Act or chapters 95 or 96 of title 26 (26 U.S.C.) shall be as follows:

(1) Except as provided in paragraph (a)(2) of this section, in the case of a violation of the Act or chapters 95 or 96 of title 26 (26 U.S.C.), the civil penalty shall not exceed the greater of $7,500 or an amount equal to any contribution or expenditure involved in the violation.

(2) Knowing and willful violations.

(i) In the case of a knowing and willful violation of the Act or chapters 95 or 96 of title 26 (26 U.S.C.), the civil penalty shall not exceed the greater of $16,000 or an amount equal to 200% of any contribution or expenditure involved in the violation.

(ii) Notwithstanding paragraph (a)(2)(i) of this section, in the case of a knowing and willful violation of 2 U.S.C. 441f[8], the civil penalty shall not be less than 300% of the amount of any contribution involved in the violation and shall not exceed the greater of $60,000 or 1,000% of the amount of any contribution

---

[7] Rivera also fails to address this issue in his own summary judgment motion. *See* ECF No. 139. Nor does he address it in his reply brief submitted in support of his summary judgment motion. *See* ECF No. 152. And it goes without saying that Rivera did not address this issue in his statement of uncontroverted facts submitted in support of his motion for summary judgment. *See* ECF No. 140. Thus, Rivera has not made any opposition to the FEC's contentions regarding the Court's issuance of a civil penalty in this case.

[8] 2 U.S.C. § 441f was editorially reclassified as 52 U.S.C. § 30122.

involved in the violation.

11 C.F.R. § 111.24. "FECA grants district courts broad authority to fashion remedies for violations of the statute." *Fed. Election Comm'n v. Craig for U.S. Senate*, 816 F.3d 829, 847 (D.C. Cir. 2016). This Court in exercising its discretion to determine an appropriate civil remedy in this case considers the following factors: "(1) the good or bad faith of the defendants; (2) the injury to the public; (3) the defendant's ability to pay; and (4) the necessity of vindicating the authority of the responsible federal agency." *Fed. Election Comm'n v. Craig for U.S. Senate*, 70 F. Supp. 3d 82, 97 (D.D.C. 2014), aff'd, 816 F.3d 829 (D.C. Cir. 2016) (quoting *FEC v. Furgatch*, 869 F.2d 1256, 1258 (9th Cir.1989) (citing *United States v. Danube Carpet Mills, Inc.*, 737 F.2d 988, 993 (11th Cir.1984)).

## A. RIVERA'S VIOLATIONS WERE KNOWING AND WILLFUL

Based upon the evidence adduced in this case, the Court finds that Rivera knowingly and willfully violated 52 U.S.C. § 30122 when he orchestrated and participated in a scheme to make contributions in the name of another. "In 2012 [Rivera] was the incumbent congressman for the 25th Congressional District." Statement of Uncontroverted Facts in Support of Rivera's Motion for Summary Judgment, Ex. D (Affidavit of David Rivera), ECF No. 140-4. As a U.S. Congressman, at that time, Rivera was well aware of and understood FECA's requirements that campaign contributions must be accurately disclosed to the public. Yet, Rivera still acted in a manner to avoid FECA's disclosure requirements.

Moreover, Rivera's acts of: using cash to make contributions to the Sternad Campaign to thereby avoid a paper trail reflecting that he was the source of the contributions; utilizing Alliegro and other third parties as the "middleman" in the scheme to transfer funds to and/or pay invoices on behalf of the Sternad Campaign; and directing Sternad, through Alliegro, in how to complete and submit false FEC filings, amongst other actions, demonstrate Rivera's bad faith. And these actions show that Rivera had full knowledge of the facts as well as the unlawful nature of his actions. *See United States v. Whittemore*, 944 F. Supp. 2d 1003, 1006 (D. Nev. 2013), aff'd, 776 F.3d 1074 (9th Cir. 2015) ("The court finds that the 'willfulness' requirement for violations of § 441f means general knowledge of unlawful conduct.") (citing *Bryan v. United States*, 524 U.S. 184, 196 (1998)). Accordingly, the Court agrees with the FEC that the evidence adduced in this case demonstrates that Rivera knowingly and willfully made $75,297.31 in contributions to the Sternad campaign in the name of another. In accordance

with 11 C.F.R. § 111.24, the maximum penalty possible against Rivera would be $752,973.10.

## B. RIVERA'S VIOLATIONS INJURED THE PUBLIC

As previously mentioned, in fashioning a penalty for Rivera's actions, the Court must evaluate where Rivera's violations of FECA injured the public. *Craig*, 70 F. Supp. 3d at 97. Here, it is hard to imagine a scenario in which Rivera's brazen violations of FECA would not have injured the public. As the court in *Craig* recognized, "there is always harm to the public when FECA is violated." *Id.* at 99. Here, the public was harmed when it was fed false information regarding the true financier of Sternad's campaign. These types of violations serve to erode and undermine the public's confidence in its representative democracy. This is no laughing matter. Representative democracy is the cornerstone of the United States of America's entire system of government. And, as a U.S. Congressman – at that time – Rivera was or should have been keenly aware of that fact. The Court therefore finds that Rivera's brazen violations harmed the public because the electorate was deprived of accurate information regarding Rivera's role in financing Sternad's campaign. *See Furgatch*, 869 F.2d at 1259 (9th Cir. 1989) ("The importance of the FECA's reporting and disclosure provisions, and the difficulty of proving that violations of them actually deprived the public of information, justify a rule allowing a district court to presume harm to the public from the magnitude or seriousness of the violation of these provisions.").

## C. RIVERA HAS THE ABILITY TO PAY THE FINE

Next, the Court finds that Rivera has the ability to pay the fine that the FEC has requested in this matter. The FEC is seeking a fine of $456,000 or 700% of the amount at issue in Rivera's violations of FECA's ban against contributions in the name of another. As previously discussed, the FEC could have sought a fine of 1,000% of the $75,927.31 worth of contributions that Rivera illegally made in the name of another. To demonstrate Rivera's ability to pay the $456,000 fine, the FEC has presented this Court with Rivera's 2015 Disclosure Statement, filed in 2016, in which he asserted that his net worth was $1,511,968. FEC Mot. Summ. J., Ex. 36, ECF No. 142-37. Further, the FEC has advised this Court of a 2020 breach of contract action pending against Rivera's consulting firm in which it is alleged that the firm, Interamerican Consulting, Inc., was paid $15 million pursuant to a $50 million contract. *See PDV USA, Inc., v. Interamerican Consulting, Inc.*, 2020 WL 2479227 (S.D.N.Y.) (alleging "PDV USA was injured by the Defendant's breach of the Agreement. PDV USA

paid the first three invoices issued by Defendant, a total of $15 million, but received no evidence that any services were ever performed on behalf of PDV USA or PDVSA."). The Court, on its own initiative, has reviewed the State of Florida's Division of Corporations online records and has determined that Rivera is in fact the President of Interamerican Consulting, Inc.[9] The Court, therefore, finds that Rivera has the ability to pay a $456,000 fine in this case. In reaching this conclusion the Court notes that such a civil penalty will also vindicate the FEC's authority and strengthen its ability to enforce 52 U.S.C. § 30122.

## V.   PERMANENT INJUNCTION

The FEC requests that the Court declare that Rivera violated 52 U.S.C. § 30122 and permanently enjoin him from violating this provision again. "An injunction is appropriate 'if there is a reasonable likelihood that the wrong will be repeated.'" *Craig*, 70 F. Supp. 3d at 101–02 (quoting *FEC v. Am. Fed. of State, Cnty., & Mun. Employees–P.E.O.P.L.E. Qualified*, No. 88–3208(RCL), 1991 WL 241892, at *1 (D.D.C. Oct. 31, 1991); *see also FEC v. Friends of Jane Harman*, 59 F.Supp.2d 1046, 1057, 1059 (C.D. Cal.1999) (declining to issue an injunction where: the case "involve[d] a detailed analysis of complex statutes and regulations," the defendants' violations were not "substantial nor obvious," the Harman campaign no longer existed, and Representative Harman was no longer in office). The Court finds that a permanent injunction is appropriate here. Rivera's illegal conduct was egregious. Again, amongst other acts, Rivera: used cash to make contributions to the Sternad Campaign to avoid a paper trail; utilized Alliegro (and other third parties) as the "middleman" in the scheme to transfer funds to and/or pay invoices on behalf of the Sternad Campaign; and directed Sternad, through Alliegro, in how to complete and submit false FEC filings. These acts demonstrate Rivera's awareness that making contributions in the name of another is illegal; yet, Rivera orchestrated this unlawful scheme despite his awareness of its illegality.

Moreover, there is a danger that Rivera's conduct will continue. First and foremost,

---

[9] The Court can and does take judicial notice of the State of Florida's public record reflecting Interamerican Consulting, Inc.'s January 27, 2021 Annual Report that was submitted by Rivera and identifies Rivera as the President of Interamerican Consulting, Inc. *See In re Willingham*, 3:11-AP-00269-JAF, 2014 WL 3697556, at *2 (Bankr. M.D. Fla. July 18, 2014) ("A court may take judicial notice of the records of the State of Florida, Division of Corporations.") (citing *Milliken v. Kranz Tree Serv., Inc.*, No. 6:08–cv–822–Orl–28–DAB, 2008 WL 4469882 at *1 n.1 (M.D. Fla. Oct. 2, 2008)).

as his filings in this case demonstrate, Rivera continues to refuse to take responsibility for his illegal conduct. And, second, Rivera continues to run for office. In his Answer to the FEC's Amended Complaint, Rivera admitted that "[i]n March 2017, [he] filed paperwork with the Florida Division of Elections as a candidate in 2018 for election to represent Florida's 105th House District." ECF No. 50 at ¶ 6. Thus, there is a distinct possibility that Rivera will run for federal office again. As a result of the above, the Court agrees that an injunction is appropriate here to prevent Rivera from making contributions in the name of another (i.e. violating 52 U.S.C. § 30122) in the future. *See Fed. Election Comm'n v. O'Donnell*, CV 15-17-LPS, 2017 WL 1404387, at *5–6 (D. Del. Apr. 19, 2017) (holding that a permanent injunction was warranted where the defendant had not stated that she would not run for federal office again, the defendant continued to operate her political action committee, and the defendant's violations of FECA involved her using campaign funds to pay for her personal residence and utilities for multiple years).

In essence, the Court will be permanently enjoining Rivera from committing future violations of 52 U.S.C. § 30122. This seems unnecessary considering that violating 52 U.S.C. § 30122 is already unlawful and prohibited conduct under the very terms of the statute; nonetheless, based upon Rivera's past conduct it is necessary for this Court to also bar him from violating the statute. Perhaps by virtue of the Court barring Rivera from engaging in similar unlawful conduct in the future, "that will do the trick" in convincing Rivera – a former U.S. Congressman – to stop violating the law.

## CONCLUSION

In short, as discussed above, the Court finds that the FEC has demonstrated its entitlement to summary judgment in this case. Therefore, for the reasons asserted above, it is **ORDERED and ADJUDGED** as follows:

1. FEC's Motion for Summary Judgment (ECF No. 142) is **GRANTED**.

2. Rivera's Motion for Summary Judgment (ECF No. 139) is **DENIED**.

3. By separate order, the Court will issue a civil penalty against Rivera in the amount of $456,000.

4. Additionally, by separate order, the Court will enter a permanent injunction against Rivera to prohibit him from making campaign contributions in the name of another in violation of 52 U.S.C. § 30122.

5. Within ten days of the date of this Order, the FEC shall provide the Court with a proposed order setting forth the civil penalty and permanent injunction to be entered against Rivera.

6. FEC's Consent Motion to Modify Scheduling Order (ECF No. 134) and Rivera's Agreed Motion to Reschedule Trial Date and Trial Related Deadlines (ECF No. 162) are **DENIED AS MOOT**.

**DONE and ORDERED** in Chambers at Miami, Florida this 23rd day of February 2021.

*Marcia G. Cooke*
_____
MARCIA G. COOKE
United States District Judge

Copies furnished to:

*Jonathan Goodman, U.S. Magistrate Judge*
*Counsel of Record*